**TWENTIETH CENTURY–FOX FILM CORPORATION, a corporation, Plaintiff,**

v.

**WOODS AMUSEMENT CORPORATION, a corporation; Edwin Silverman; Jack Silverman, and Ralph Smitha, Defendants.**

**WOODS AMUSEMENT CORPORATION, a corporation, Counterplaintiff,**

v.

**TWENTIETH CENTURY–FOX FILM CORPORATION, a corporation; Harry Buxbaum; Joseph Sugar, and R. R. Schmertz, Counterdefendants.**

**No. 67 C 707.**

United States District Court
N. D. Illinois, E. D.
Sept. 18, 1969.

Robert W. Bergstrom, Bergstrom & Olson, Chicago, Ill., for plaintiff.

Joseph D. Block and Joel J. Sprayregen, Chicago, Ill., Aaron, Aaron, Schimberg & Hess, Chicago, Ill., of counsel, for defendants.

ROBSON, District Judge.

### DECISION ON THE MERITS

Twentieth Century-Fox Film Corporation (Fox), a Delaware corporation with its principal place of business in New York, seeks recovery of payments allegedly due under three film rental agreements with the defendant Woods Amusement Corporation (Woods), an Illinois corporation with its principal place of business also in Illinois. The individual defendants, Edwin Silverman, Jack Silverman and Ralph Smitha, managing agents of Woods, are charged with conspiring to injure the plaintiff and with maliciously interfering with the plaintiff's business relationships. The defendants counterclaim that the licensing

agreements in question were not binding contractually, that Fox made false statements and breached a number of oral agreements with Woods concerning the leasing of specific motion pictures, and that these acts constituted a common law conspiracy between Fox and its General Sales Manager Joseph Sugar, its Central Division Manager Harry S. Buxbaum, and its Chicago Exchange Manager R. R. Schmertz, all of whom have been named as counterdefendants herein. The counterclaim also alleges that this conduct was violative of federal and state antitrust and fair trade laws. After a trial on the merits, this court is of the opinion that judgment should be rendered for the plaintiff against the defendant Woods on the three exhibition agreements.

## THE "IN LIKE FLINT" AGREEMENT

Count I of the amended complaint charges the defendant Woods with breach of a written exhibition contract and seeks recovery under the liquidated damage provision of that contract.[1] Fox and Woods executed the contract in question for the first-run showing of "In Like Flint" at the Woods Theatre in Chicago to open the week preceding Easter Sunday, March 26, 1967. Fox had sceduled the national release of this feature film for various days in the week preceding Easter Sunday.[2] Nationwide publicity was scheduled to be released on or prior to March 26, 1967. Theaters in almost all of the major cities in the United States commenced exhibition of the film prior to March 26. The contract in question provided that the film was to open "about March 22, 1967." This day fell upon the Wednesday before Easter Sunday; Wednesday was the usual day on which the Woods Theatre commenced the exhibition of new feature films. In the Chicago Exchange area,[3] smaller key cities such as Champaign, Danville and Decatur were scheduled to commence exhibition of the film on or after Easter Sunday in order to benefit from the Chicago newspaper publicity and word of mouth publicity from Chicago as the central city of the area.

The contract was negotiated between the parties well in advance of the anticipated first-run exhibition. The contract bears a typewritten date of November 25, 1966, and a Fox home office approval date of December 20, 1966. Fox was obligated to pay all advertising expenses for pre-opening and opening week, and thereafter to pay half of such expenses. The contract set forth stipulated rental terms based upon a schelude of percentages of gross receipts.[4] Fox was given discretion to terminate the indefinite

---

1. Paragraph 3 of the exhibition contract provides as follows:

   "3. DAMAGES—FAILURE TO EXHIBIT. If Exhibitor fails or refuses to exhibit any picture as herein provided, Exhibitor shall pay to Distributor, as liquidated damages for each day it should have exhibited the picture, a sum equal to the percentage specified in the Schedule of the theatre's average daily gross receipts, or a sum equal to the figure specified in the Schedule for each person admitted to the theatre, during the exhibition thereat of the last three of Distributor's pictures rented to the theatre on the same terms as the picture which Exhibitor so failed or refused to exhibit. * * * "

2. The evidence indicates that Easter week is one of the major grossing weeks in the motion picture business. "In Like Flint" opened in New York on March 15, 1967; in 24 other major cities on March 22; in Louisville and Houston on March 23, and in three other cities on March 24.

3. The Chicago Exchange area served by the Chicago branch office of Fox includes Illinois north of Springfield and Lake County, Indiana.

4. The distributor's share of gross receipts were provided to be as follows:

   | | |
   |---|---|
   | 1st week | 60% |
   | 2nd week | 50% |
   | 3rd week | 40/50% |
   | 4th week | 35% |
   | 5th week | 30% |
   | 6th week | 25% |

   The sixth week's percentage was to apply to any subsequent holdover weeks.

run. The evidence indicates that Woods was obligated to exhibit the film for six weeks; further exhibition would be only upon agreement of the parties.

After execution of the contract, the agents of Woods did not communicate with Fox concerning "In Like Flint" until March, 1967. However, on or about January 10, 1967, the defendant Ralph Smitha, on behalf of Woods, entered a written exhibition agreement with another distributor which committed the Woods Theatre to an indefinite run of a film entitled "Blow-Up." By the terms of this agreement, Woods was to exhibit "Blow-Up" for an unlimited run to open not later than February 8, 1967, and to "continue its unlimited run" as long as the weekly gross equaled $16,000. The gross admissions of the Woods Theatre during the "Blow-Up" exhibition indicate that the holdover terms were operative until May 4, 1967.[5]

On March 10, 1967, Fox served the defendant Smitha with a written demand that the "In Like Flint" agreement be honored, and that the exhibition commence on or about March 22, and not later than March 24. The defendants responded on March 16, 1967, by repudiating the contract. By the time Fox received this notification, it was too late to license the film with any other first-run Chicago exhibitor for Easter week. Subsequently, Fox licensed the film for exhibition at the United Artists Theatre. The picture was exhibited on a first-run basis at that theater for six weeks and five days, commencing April 7, 1967.

▮▮ The defendants first contend that the exhibition agreement for "In Like Flint" was not contractually binding because the provision giving Fox dis-

cretion to terminate the indefinite run of the film lacked mutuality. However, the discretionary right granted Fox to continue or terminate the run after the March 22 opening was a valid option granted for valuable consideration. Armstrong Paint and Varnish Works v. Continental Can Co., 301 Ill. 102, 133 N.E. 711 (1922); Industrial Natural Gas Co. v. Sunflower Natural Gasoline Co., 330 Ill.App. 343, 71 N.E.2d 199 (4th Dist. 1947). A contract need not be reciprocal as to every separate obligation; a contract is sufficient if it legally obligates both parties to abide by and perform its conditions. Hillman v. Hodag Chemical Corp., 96 Ill.App.2d 204, 238 N.E.2d 145 (1st Dist. 1968); Hall v. Gruesen, 22 Ill.App.2d 465, 161 N.E.2d 345 (1st Dist. 1959). Fox was obligated to deliver "In Like Flint" to Woods on March 22, 1967, for the first exclusive exhibition of the film in the Chicago area. Fox was restrained from licensing the film to any other Chicago exhibitor until after that run. This constituted a substantial restriction upon a major revenue-producing activity of the plaintiff.[6] Furthermore, Fox was also obligated to pay all of the advertising costs for the pre-opening and first week of the exhibition at the Woods Theatre, and for half of the advertising expenses thereafter. The stipulated evidence shows that this was a substantial obligation exceeding $20,000. In exchange for these benefits, Woods was obligated to commence exhibition of "In Like Flint" on March 22, 1967, and to continue exhibition thereafter until the run was terminated at the option of the distributor or six weeks had elapsed. This court therefore finds that Woods breached the exhibition contract when its agents repudiated the agreement to ex-

---

5. The "Blow-Up" grosses were as follows:

| PLAY DATE | GROSS |
| --- | --- |
| February 10–16 | $39,210.02 |
| February 17–23 | 34,620.95 |
| February 24–March 2 | 27,945.40 |
| March 3–9 | 29,300.20 |
| March 10–16 | 26,773.47 |
| March 17–23 | 29,033.16 |
| March 24–30 * | 33,251.75 |
| March 31–April 6 | 23,962.13 |
| April 7–13 | 22,122.53 |
| April 14–20 | 20,606.58 |
| April 21–27 | 17,697.59 |
| April 28–May 4 | 16,138.12 |

* Easter week.

6. The evidence shows that exhibition of "In Like Flint" in the Chicago Exchange area later resulted in over $275,000 in film rentals.

hibit "In Like Flint" at the Woods Theatre commencing on or about March 22, 1967.

The defendants also challenge the validity of the liquidated damages provision of the exhibition contract. They contend that Fox did not suffer any actual damages by reason of the late opening of "In Like Flint" at another theater, and recovery under the liquidated damages provision would therefore constitute a penalty. However, 'this court finds the provision for liquidation damages both valid and reasonable. The difficulty in ascertaining the actual impact of the delayed first-run exhibition of the film upon hundreds of theaters in Chicago and surrounding cities affected by Chicago necessitates the application of a liquidated damages clause. A liquidated damages clause should be upheld where such a provision is reasonable at the time of contracting, even absent proof of any actual damages. Bethlehem Steel Co. v. City of Chicago, 234 F.Supp. 726 (N.D.Ill.1964), aff'd 350 F.2d 649 (7th Cir. 1965). When parties agree to have damages ascertained on a particular basis, as the parties did here, courts will not declare such a provision void as a penalty unless there is good ground for it. Covington v. Shaffer, 80 Ill.App.2d 164, 224 N.E.2d 26 (4th Dist.1967). Application of the liquidated damages clause [7] to the uncontroverted facts of this case for the six weeks that Woods was obligated to exhibit the film yields the following results:

| WEEK | AVERAGE GROSS EACH WEEK ON 3 PRECEDING FOX PICTURES | "FLINT" TERMS | "FLINT" LIQUIDATED DAMAGES |
|---|---|---|---|
| 1st week | $25,882 | 60% | $15,529.20 |
| 2nd week | 17,426 | 50% | 8,713.00 |
| 3rd week | 18,166 | 40%* | 7,266.40 |
| 4th week | 14,118 | 35% | 4,941.30 |
| 5th week | 13,863 | 30% | 4,158.90 |
| 6th week | 11,502 | 25% | 2,875.50 |
| | | Total | $43,484.30 |

This court therefore concludes that Fox is entitled to recover against the corporate defendant Woods the sum of $43,484.30 as liquidated damages for breach of the "In Like Flint" exhibition contract.

Fox seeks an additional $43,484.-30 recovery against the individual defendants as punitive damages for their allegedly willful and malicious conduct. Specifically, Fox charges that the defendants Ralph Smitha, Edwin Silverman and Jack Silverman committed a tortious injury to its business by using the "In Like Flint" exhibition contract to prevent Fox from licensing that film to any other exhibitor for Easter week. However, the evidence does not indicate that any of the defendants communicated with any other exhibitor to prevent Fox from licensing "In Like Flint." Nor does the evidence indicate that the defendants in any way interfered with any contractual relationship of the plaintiff. The individual defendants were acting as managing agents of the corporate defendant. This court does not find any evidence to support the contention that the defendants conspired to harm the plaintiff's business or were otherwise guilty of any malicious conduct. The claim for punitive damages against the

7. See note 1, *supra.*

* The scheduled percentage is "40/50%"; however, the plaintiff is just seeking the lower figure.

individual defendants is therefore denied.

## THE "FANTASTIC VOYAGE" AND "WAY WAY OUT" AGREEMENTS

In Counts II and III of the amended complaint, Fox seeks rentals due under exhibition contracts for the first-run feature films entitled "Fantastic Voyage" and "Way Way Out." The provisions of these two agreements are identical except that the opening of "Fantastic Voyage" was to follow a film entitled "Stage Coach," and the opening of "Way Way Out" was then to follow "Fantastic Voyage." The film rental schedules of both agreements, expressed as the distributor's share of gross receipts, were provided to be as follows:

| | |
|---|---|
| 1st week | 60% |
| 2nd week | 50% |
| 3rd week | 40/50% * |
| 4th week | 35% |
| 5th week | 30% |
| 6th week | 25% |

The sixth week's percentage was to apply to any subsequent holdover weeks. The contracts obligated Fox to pay all advertising expenses for pre-opening and opening week, and to assume half of such expenses thereafter. Both agreements also contained the following provision:

"9. CHANGES IN WRITING. This agreement is complete and all promises, representations, understandings, offers and agreements in reference thereto have been expressed herein. No change or modification hereof shall be binding upon the Distributor unless in writing signed by an officer of or a person authorized by the Distributor."

The stipulated evidence shows that Woods exhibited "Fantastic Voyage" from September 28, 1966, to and including November 7, 1966, and exhibited "Way Way Out" from November 8, 1966, to and including December 6, 1966. The contracts obligated Woods to keep comprehensive records of its gross admission receipts. *Payment of the film rental was expressly due immediately after the last exhibition of each picture.*

To date, Woods has failed to pay any portion of the rental due on either film. Woods asserts as its defense that it is the long-standing custom and practice in the motion picture industry not to consider as binding the schedule of rental percentages characterized as the distributor's share of gross receipts.[8] In essence, it is contended that the exhibitor's consideration terms under exhibition agreements are negotiated *after* the distributor has fully executed its obligations under the agreement, i. e., provided the exclusive use of a first-run feature film, and assumed advertising expenses for the exhibitor's benefit. The defendants' witnesses, exhibitors experienced with these agreements, testified that *all the terms of the agreements were bind- and except the rental provision,* the sole consideration supplied by the exhibitor. However, the only evidence offered in support of this purportedly well-established custom and usage was the citation of previous incidents of post-exhibition negotiations where the distributor and exhibitor reached an agreement to settle for an amount less than that due under an exhibition contract. The plaintiff showed several instances where payment was for the same amount specified in the exhibition agreement. Upon the evidence presented by the defendants, this court cannot find any established custom and usage in the motion picture industry which would void *ab initio* the rental provisions of an exhibition agreement. At best, the defendants have shown *a custom of renegotiation and settlement of contract claims* after the distributor has fully performed its obligations under an executory contract. Furthermore, even had the defendants successfully shown that express rental terms

---

* The plaintiff seeks to enforce the schedule at the 40% figure.

8. Woods also asserts that "Fantastic Voyage" was delivered late. However, this contention is unsupported by the evidence. That film was delivered in the agreed upon sequence with other films supplied by Fox.

were not treated as binding by parties to exhibition agreements, evidence concerning the nature and object of an agreement, the surrounding circumstances, and the construction the parties themselves place upon an agreement are proper only where the terms of a contract are ambiguous and there is doubt as to their meaning. Luciani v. Certified Grocers of Illinois, Inc., 105 Ill.App.2d 448, 245 N.E.2d 523 (1st Dist. 1969); Green v. Aerosol Research Co., 374 F.2d 791 (7th Cir. 1967); Pocius v. Halvorsen, 30 Ill. 2d 73, 195 N.E.2d 137, 13 A.L.R.3d 662 (1963). The interpretation placed upon a contract by the parties themselves cannot be used to force new and different meaning into the contract or to overthrow the plain terms of the contract. Luciani v. Certified Grocers of Illinois, Inc., *supra*. This court finds that the rental terms of the agreements in question are clear and unambiguous. Therefore, Fox is entitled to recovery of the following rentals by application of the stipulated facts to the terms of the two exhibition agreements:

## "FANTASTIC VOYAGE"

| WEEK OF EXHIBITION | GROSS ADMISSIONS | CONTRACT TERMS | FILM RENTAL |
|---|---|---|---|
| 1st week | $31,947.46 | 60% | $19,168.48 |
| 2nd week | 21,422.52 | 50% | 10,711.26 |
| 3rd week | 20,209.36 | 40% | 8,083.74 |
| 4th week | 15,163.59 | 35% | 5,307.29 |
| 5th week | 12,948.17 | 30% | 3,884.45 |
| 6th week | 9,817.96 | 25% | 2,454.49 |
| | | Total Film Rental | $49,609.71 |
| | | LESS: Allowance for plaintiff's share of advertising costs | 37,118.74 |
| | | Net Rental Due | $12,490.97 |

## "WAY WAY OUT"

| WEEK OF EXHIBITION | GROSS ADMISSIONS | CONTRACT TERMS | FILM RENTAL |
|---|---|---|---|
| 1st week | $15,951.18 | 60% | $ 9,570.70 |
| 2nd week | 9,550.67 | 50% | 4,775.34 |
| 3rd week | 14,656.22 | 40% | 5,862.49 |
| 4th week | 6,011.23 | 35% | 2,103.93 |
| 5th week | 402.71 | 30% | 120.81 |
| 6th week | | 25% | |
| | | Total Film Rental | $22,433.27 |
| | | LESS: Allowance for plaintiff's share of advertising costs | 13,121.67 |
| | | Net Rental Due | $ 9,311.60 |

■ This court further finds that the two exhibition contracts in question are instruments in writing within the meaning of Ill.Rev.Stat.1967, Ch. 74 § 2. Therefore, Fox is entitled to interest at the rate of five per cent per annum on the film rentals from the last day of exhibition when the rentals became due, until the date the judgment order is entered.

## THE COUNTERCLAIM

The defendant Woods charges that Fox and the individual counterdefendants conspired to injure its business, thereby violating federal and state antitrust and fair trade laws. The conspiracy allegedly consisted of false statements made by Fox agents and their subsequent breaches of oral agreements obligating Fox to license certain feature films to Woods. None of these alleged "agreements" were reduced to writing. The record is devoid of any credible evidence in support of the various theories and conclusory allegations advanced in the counterclaim, and the counterclaim is therefore denied.

## ORDERS

The plaintiff is directed to revise its findings of fact and conclusions of law to conform with this opinion. As a part of said findings, judgment should be rendered for the plaintiff. In the judgment order, the plaintiff shall compute damages to include the following: $43,484.30 for breach of the "In Like Flint" agreement; $12,490.97, plus five percent interest running from November 7, 1966, to and including the date of the judgment order, as the amount due under the "Fantastic Voyage" agreement; and $9,311.60, plus five percent interest running from December 6, 1966, to and including the date of the judgment order, as the amount due under the "Way Way Out" agreement. The defendant Woods' counterclaim should be dismissed and the costs herein assessed against the defendant.