Sarvelle Lorsch, Administrator to Collect of the Estate of Frederic Z. Lorsch, Deceased, and Bernard Miller, d/b/a Insurance Budget Plan, Plaintiffs-Appellees, v. Gibraltar Mutual Casualty Company and Gibraltar Insurance Company, Defendants-Appellants.

Gen. No. 53,661.

First District, Fourth Division.

July 22, 1970.

Narusis & Stimson, of Chicago (Ellis B. Rosenzweig and Robert G. Johnston, of counsel), for appellants.

Wilbur S. Legg, Alex R. Seith, R. R. McMahan, Lord, Bissell & Brook, of Chicago, for appellees.

MR. PRESIDING JUSTICE STAMOS delivered the opinion of the court.

Defendants, Gibraltar Mutual Casualty Company and its successor, Gibraltar Insurance Company,* appeal from a judgment of $29,413.31 entered in favor of plain-

---

\* Gibraltar Mutual Casualty Company extended casualty lines of insurance including automobile coverage. It has since been dissolved and is now organized as a stock company, Gibraltar Insurance Company, one of the carriers comprising the Heritage Insurance Group.

tiffs, Frederic Z. Lorsch and Bernard Miller, d/b/a Insurance Budget Plan (IBP) for unearned premiums on cancelled insurance policies.

IBP was in the business of financing premiums on automobile insurance policies, and financed the 199 policies written by defendants from August, 1960, to May, 1961, involved in this dispute. IBP's method of operation was to deal indirectly with the insured-borrowers through various insurance brokerages and agencies (hereinafter referred to as producers) which solicited business for insurance carriers on a commission basis. The producers soliciting the accounts involved in this dispute were Schoeneman Insurance Service and Major Insurance Service (both operated by Bernard Schoeneman), Gene W. Fawcett Agency, Triangle Insurance Agency, Inc., Certified Insurance Agency, Vulcan Insurance Agency and Fremac Insurance Agency.

When a prospective insured contacted a producer for automobile coverage and desired to finance the premiums, the producer would first submit the application for insurance to the defendants. If the application were approved, the issuing agent, Aero Marine Management Co.** would send a "daily" (Memorandum of coverage) covering the insured to the producer.

The insured would then sign a form premium finance contract supplied the producer by IBP. The finance contract provided for assignment of the insurance policy to the producer along with the right of policy cancellation upon default of loan payments. The contract also provided that the producer would have the right to any return premiums. However, in the case of the Fawcett Insurance Agency, the producer would enter the insured's name on the finance contract without obtaining his signature.

---

** The sole agency licensed with the Director of Insurance to bind defendants.

The producer would then assign the finance contract to IBP and also provide them with a copy of the insured's policy. IBP then issued a coupon payment booklet for the loan installments to the insured and notified defendants of the assignment and premium financing, and of IBP's assignment rights. The notice provided that if the assignment were unsatisfactory, the defendants were to notify IBP within ten days.

Defendants presented testimony to show that when they received a notice of assignment from a finance company, the original of the notice was placed with the policy in the files and the attached duplicate was sent back to the finance company stamped with the following limitation:

> "The assignment will not be honored unless the premium finance check is made payable to Gibraltar Mutual Casualty Company."

However, plaintiff Bernard Miller testified that IBP never sent a duplicate copy of the notice to the carriers in the instances here involved and that IBP never received a return memorandum stamped with the above limitation.

After the ten-day period had elapsed without notice of objection from defendants, IBP would draft a check payable either to the producer or defendants for the financed portion of the premium.* In the case of premium financing on policies issued by Schoeneman and Fawcett, the checks were made payable to the producer. As it turned out, these amounts were never forwarded by Fawcett and Schoeneman to defendants, and that basically is the reason for this litigation. However, where the

---

* The insured was required to pay 20% of the premium to the producer who deducted his commission and paid the remainder, if any, to IBP. The financed portion, therefore, was generally 80%.

354

policies were issued through Triangle, Fremac, Vulcan and Certified, the checks were made payable to defendants pursuant to defendants' specific instructions.

Plaintiff Frederic Lorsch testified that only in a few instances was he required by the carriers to pay them directly but that he was never so instructed in the cases of Fawcett and Schoeneman. However, Mr. Casati, president of the defendants, testified that he instructed Miller to make all Fawcett policy checks payable directly to defendants.

On April 10, 1961, after most of the policies here involved had been issued, IBP requested defendants to confirm the fact that both Schoeneman and Fawcett were direct agents of the carrier. Defendants confirmed as to both, but on May 2, 1961, they notified IBP that Fawcett was a "producer-subagent" being an agent of Aero Marine.

Both Schoeneman and Fawcett were authorized by IBP to act as collecting agents for the loan installments. When subsequent checks for premium financing were made payable to them, the amount of the unremitted loan installments collected by them were deducted to balance accounts. In all other cases the insured borrowers would make their installment payments directly to IBP.

When an insured-borrower defaulted on the loan payments, IBP would send a cancellation notice to defendants who in all cases here involved cancelled the policy pursuant to IBP's request. However, instead of remitting any amounts of unearned premiums to IBP, defendants would credit the producer's account.

After IBP's repeated requests for the return premiums on the cancelled policies, they filed this suit in equity praying for an accounting and payment of the return premiums. Defendants filed a jury demand which was subsequently stricken and the cause was referred to a Master in Chancery.

The Master concluded that the producers were either agents or subagents of the defendants and that, therefore, they had received payment of premium from IBP on behalf of defendants who were now liable to plaintiffs for repayment of the unearned portions.

Defendants filed 23 objections to the Master's Report which were denied, and, standing as exceptions, they were subsequently overruled by the Chancellor who approved and adopted the Report as submitted. Judgment was entered in favor of plaintiffs for $29,413.31, and defendants appealed.

OPINION

Defendants initially contend that they were denied their right to a jury trial when the court improperly exercised its equity jurisdiction to require an accounting. They correctly assert that an action for an accounting is one at law unless: (1) discovery is necessary, (2) complicated or mutual accounts are involved or (3) a fiduciary relationship exists between the parties. However, defendants maintain that none of these factors is present in this suit.

Plaintiffs contend that the case was a proper subject for equity jurisdiction because of the numerous and complicated accounts involved.

In Corpus Juris Secundum, vol 1, page 653, it is stated:

> "No precise rule can be laid down as to what constitutes such complication of accounts as will give equity jurisdiction, that being a matter for the determination of the court in a particular case in the exercise of its discretion."

██ It is a well accepted rule of law that the mere existence of numerous accounts alone will not confer equitable jurisdiction. Hornbeek v. Hornbeek, 5 Ill App 2d 253, 125 NE2d 535. But, as stated by defendants, the

accounts must be of a nature "beyond the ken of average jurors."

In view of these standards, we find the trial court properly exercised its discretion in assuming equitable jurisdiction. Each of the 199 accounts here involved required numerous entries and prorations. It is also significant to note defendants' recitation in their petition for extension of time to answer or otherwise plead, wherein they state:

> "Defendant needs additional time to prepare an Answer or to otherwise plead *because of the* complexity and number of accounts involved." (Emphasis supplied).

■ Therefore, the trial court was correct in striking defendants' jury demand and in retaining equity jurisdiction.

Defendants next contend that the trial court erred in permitting plaintiffs to introduce into evidence the filled-in finance contract forms on policies issued through the Fawcett Agency representing over $8,000 of plaintiffs' recovery. These finance contracts bore the written names of the respective insured-borrowers. However, even a cursory examination reveals that all the names were signed in the same hand. The Master admitted the documents as written memoranda of oral financing agreements entered into by the insured-borrowers with Fawcett who had subsequently assigned the contracts to IBP.

Defendants contest this ruling of the Master contending that there is no evidence to support a finding of the existence of the oral contracts and that even if there were such evidence, the contracts would still have no basis for admissibility.

■ Where the Chancellor has approved the findings of the Master, the Appellate Court on review may still

look to the facts upon which the findings were based. Turzynski v. Libert, 122 Ill App2d 352, 259 NE2d 295 (1970).

The form finance contracts provided the producers by IBP consisted of one page separated into two sections. The upper section of the contract contains a recitation of mutual promises between the producer and the insured-borrower including an assignment of the policy to the producer. At the bottom of the upper section a blank space is provided for the signature of the insured. This is the space where the Fawcett Agency entered the names of the insureds.

Below the upper section is an "Assignment Without Recourse" where the producer assigned all right, title and interest accruing to him from the above contract to IBP.

█ All Fawcett contract forms have Fawcett's signature on the lower section with the insured's name entered on the upper section. The evidence tends to show that of the 99 Fawcett policies so issued and financed in this dispute, not one of the named insureds complained of cancellation of their insurance after being informed that the cancellation was due to default of loan payments. Further evidence tends to show that 24 policies similarly written and financed through Fawcett, but not in issue here, were subsequently cured for default of finance payments after cancellation. Therefore, we approve the Chancellor's conclusion that the evidence shows these filled-in finance "memoranda" to have been based upon existing oral contracts between Fawcett and the insureds.

█ Similarly, we also find that the "memoranda" were admissible into evidence. The forms as filled in and signed by Fawcett constitute valid contracts between IBP and Fawcett as to Fawcett's assignment of the oral contract rights and, therefore, tended to substantiate

IBP's claim to those contract rights, i. e., the right to receive return premiums.

■ The defendants repeatedly refer to these Fawcett contracts as "forgeries." However, this phraseology ignores both the findings of fact as to the existence of the oral contracts and the nature of the valid written assignment by Fawcett to IBP contained therein. The upper section of the form contract (the part to be signed by the insured) became part of the assignment to IBP by reference as a memorandum of the provisions of the assignment. The failure to execute in writing the original policy assignment is irrelevant as long as the evidence showed a valid underlying oral contract.

Defendants' next contention is that the Master erred in ruling that Casati's testimony as to a statement made by Miller at a meeting on May 31, 1961, would only be permitted to stand against Miller and not Lorsch, since Lorsch was not present at the meeting. Casati testified:

> "At that time he (Miller) stated that he didn't feel, under the circumstances, that his finance company had any rights to premiums because he knew that we had never received a nickel on any of that premium with Schoeneman."

Defendants cite Ill Rev Stats, c 106½, § 11 (1963) which provides:

> "An admission or representation made by any partner concerning partnership affairs within the scope of his authority as conferred by this act is evidence against the partnership."

■ Under the above statutory provision, Miller's admission to Casati was admissible both as to Miller and Lorsch. However, we feel that the error was inconsequential. If the admission purported to show that IBP knew of a failure on Schoeneman's part to pay defend-

ants, it could be given little weight, in light of the fact that it was made after all of the policies had been issued and financed. If the admission purported to show IBP's position as to their rights, it was mere legal conclusion.

Defendants next contend that plaintiffs are not entitled to recover unearned premiums from an insurance company which never received payment. Defendants' basic argument in this regard is that they required direct payments of premiums from plaintiffs who failed to so comply and it was error to find otherwise.

Defendants' argument is founded upon two factual interpretations of the evidence. They first maintain that plaintiffs were notified by defendants that payment was to be made directly, and that in any event, the general practice in the insurance business and the general policy of the defendants was to require a direct payment.

Secondly, defendants maintain that Schoeneman and Fawcett, who account for 168 of the 199 policies here issued, were only producers without authorization to bind the defendants or accept payment of premiums on their behalf, and that plaintiffs well knew this fact.

However, plaintiffs contend that the evidence clearly supports the Master's findings: (1) that defendants failed to notify plaintiffs of their desire for direct payment, (2) that direct payment was the extraordinary circumstance instead of the general practice and (3) that both Schoeneman and Fawcett were either agents or subagents of defendants and did have authority to accept payment of premiums on behalf of defendants.

After reviewing the evidence, we must concur with the findings of the Master as approved by the Chancellor. The evidence discloses that defendants failed to send any memoranda of the direct payment limitation to the plaintiffs. The testimony of Casati that he had informed Lorsch of the necessity for direct payment is uncorroborated by the other persons allegedly in attendance at the meeting and raises the inference

that if such directions were required, direct payment could not be considered to be the general practice.

Defendants' contention as to the status of Schoeneman and Fawcett as mere producers and not agents is refuted by defendants' written confirmation to plaintiffs of these two as "agents" and "producer-subagents."

Having held that the findings were correct as to the status of Schoeneman and Fawcett, we need not discuss questions relating to section 505 of the Insurance Code (Ill Rev Stats 1959, c 73, § 1065.52). We also feel there is no merit in defendants' contention that plaintiffs must bear the loss as one of two innocent parties to the transactions.

Defendants next contend that the trial court erred in the assessment of costs and Master's fees. Three errors are alleged: (1) the Master's fee is excessive, (2) the award of witness fees is excessive in view of the limited number of witnesses called by plaintiffs, and (3) the cost of $1,294 for the transcript of proceedings exceeds the statutory amount allowable.

Defendants contend that the $5,715.30 Master's fee was excessive and cites Strilky v. Levy, 33 Ill App2d 91, 178 NE2d 694, wherein the court sustained a Master's fee of $30 per hour for 67 hours. Defendants contrast the 1,974-page record of Strilky with 1,102-page record in the instant case to show that this case involved less complexity.

■ ■ However, the mere number of pages in the record is no true indicator of the complexity of a lawsuit. In the instant case the Master devoted 185 hours of time to the very detailed and intricate questions of law and fact. We find no abuse of discretion in the award of the Master's fee.

Defendants next contend that the witness fees of $255.76 assessed against defendants is excessive, in view of the small number of witnesses who testified for plaintiffs.

361

Witness fees allowable by statute are $10 per diem, plus 8 cents per mile (Ill Rev Stats, c 53, § 65 (1967)). Witness fees may be taxed even where the witnesses have not testified (Smith v. Kinkaid, 1 Ill App 620) and the awarding of these fees is within the sound discretion of the trial court, Chicago, P. & St. L. R. Co. v. Eaton, 136 Ill 9, 26 NE 575. We find no abuse of discretion in awarding the witness fees.

Defendants next contend that the trial court erred in taxing $1,294 against defendants for the stenographer's costs of preparing the transcript.

Section 38 (Ill Rev Stats, c 58 (1963)) provides a 15 cents per 100-word allowance to the Master for the taking of testimony and in addition thereto, a 15 cents per 100-word allowance for stenographer's services where the Master certifies that a stenographer was necessarily employed. Both allowances are taxable as part of the Master's fee to reimburse his services and costs. However, in the present case, the $1,294 taxed against defendants was not part of the Master's fee, but was a direct reimbursal of plaintiffs' half of the cost of the stenographer hired by the parties to the suit. We believe this to be beyond the purview of section 38 and find that the trial court erred in assessing this amount against defendants.

Therefore, plaintiffs shall have 30 days to file a remittitur of $1,294. Upon the filing of the remittitur the decree will stand affirmed, otherwise, the decree will be reversed and remanded with directions to enter a decree in accordance with this opinion.

Decree affirmed upon filing of remittitur; otherwise decree reversed and remanded with directions.

Affirmed upon filing remittitur within 30 days; otherwise, reversed and remanded with directions.

DRUCKER and ENGLISH, JJ., concur.