METRO-GOLDWYN-MAYER, INC., *et al.*, Plaintiffs-Appellees and Cross-Appellants, *v.* ANTIOCH THEATRE CO., INC., *et al.*, Defendants-Appellants and Cross-Appellees.

First District (3rd Division)  Nos. 61530, 62286 cons.

Opinion filed August 17, 1977.

Richard Orlikoff, John N. Tierney, and Robert J. Peters, all of Chicago, for appellants.

Bergstrom, Davis & Olson, of Chicago, for appellee Twentieth Century-Fox Film Corporation.

Jenner & Block, of Chicago, for appellee Paramount Pictures Corporation.

Mayer, Brown & Platt, of Chicago, for other appellees.

Mr. JUSTICE McNAMARA delivered the opinion of the court:

This suit was brought by nine motion picture distributors, each with a branch office in the city of Chicago, for an accounting to recover additional percentage license fees from defendants for underreporting the gross admission receipts of the latters' movie theaters. After determining that the plaintiffs were entitled to an accounting, the trial court heard evidence as to damages. On November 6, 1974, the court entered judgment in favor of plaintiffs and against defendants in the sum of $79,290.63 in additional license fees and $12,372.72 in interest, a total of $91,663.35. Subsequently the court entered an additional order against defendants awarding fees and costs to the various plaintiffs in the amount of $19,500.00 for false pleadings under Section 41 of the Civil Practice Act. (Ill. Rev. Stat. 1971, ch. 110, par. 41.) Defendants appeal from all orders while plaintiffs cross-appeal only the amount of the principal judgment and interest.

Defendants are comprised of one individual, Henry C. Rhyan and four corporations, all located in Illinois: the Antioch Theatre in Antioch; the Liberty Theatre in Libertyville; the McHenry Theatre in McHenry; and the Family Outdoor Theatre in Grayslake. Rhyan operated the four motion picture theaters as an individual proprietor prior to January 1, 1967, up until August 1, 1968. From that time through November 30, 1973, Rhyan operated the theaters as corporate entities, with himself as president and managing agent. Rhyan thus was the controlling force behind each of the theaters throughout the period covered by this litigation, January 1, 1967, to November 30, 1973. During this time period, defendants leased numerous pictures from plaintiffs to be shown in the theaters.

When Rhyan contracted to license a motion picture from an individual distributor, he used an agent, Della M. Gallo, to make the preliminary contracts with the distributor and to negotiate the terms of the agreements. Gallo, working under the name of Independent Theatre Service, represented between 30 to 40 other exhibitor accounts besides Rhyan's. Each of Rhyan's theaters paid her 25 to 35 dollars per week to take care of their bookings. Gallo's authority did not include agreeing to any specific film rental terms without obtaining the prior approval of Rhyan.

During the period of this litigation, over 700 films were exhibited in the four theaters. Separate booking arrangements and rental terms were negotiated for each film. Defendants admitted to having shown these films on the dates listed. For the full understanding of this litigation, we must provide an explanation of the intricate process through which the theater operators and picture distributors reach a final contractual accord.

Defendants participated in three types of licensing arrangements with plaintiffs. The simplest license was the "flat rental" arrangement wherein a specified amount was agreed upon between the parties as a fee prior to the film's showing. These films generally were used as second features and are not at issue in this case. In the second type, a "firm percentage" arrangement, the percentage of gross receipts to be received by the distributor was agreed upon in advance. Only 34 such contracts are here involved. Thus the bulk of the licenses involved in this suit are of the third type, the "reviewable percentage film license." This type is the most common arrangement in the industry as well as the most indefinite regarding the terms of the agreement itself. A range between two percentage figures generally is determined before the film is shown. Sometimes only one figure is given, but in either instance the contract is marked as reviewable. After the film has run at a specific theater, the final percentage is determined through negotiations between the operator's agent and the distributor's branch manager. It is this latter negotiation phase which constitutes the crux of the damage portion of this lawsuit. While many factors unrelated to gross intake contribute to the resolution of the eventual terms, it is apparent that the determination of the final percentage rests primarily upon an accurate box office report of gross admission receipts.

After denying defendants' motion to strike and dismiss the complaint, the trial court stayed discovery in the case until the right to an accounting was resolved at trial.

Mr. Philip Kornfeld, an auditor for plaintiffs' law firms for 20 years, testified for plaintiffs that he had been involved in over a thousand audits of theaters and was well acquainted with the procedures involved. On June 11, 1969, plaintiffs' law firm wrote Rhyan requesting that it be permitted to inspect the box office reports and other books and records pertaining to the exhibitions, tickets, admissions and income of each of the defendant theaters. Defendants' counsel replied that the records would be available for inspection in his office. On September 16, 1969, Kornfeld appeared at the office per mutual assent. The only records produced were purported to be the cashiers' daily box office statements on all percentage pictures shown between 1964 and May 1969. These statements included the date, the title of the picture, the opening and closing ticket numbers for that day, each price class, and the receipts as computed from the ticket numbers and price class. Kornfeld accepted these records without prejudice, but informed defense counsel that additional records would be needed. On September 19, 1969, Kornfeld reached the conclusion that the distributors had been defrauded. He noted that the box office records from October 1967 to March 1969 did not appear to be authentic as they showed no signs of wear and seemed to

have been prepared recently. He also noted that the handwriting on the records appeared to be identical even though different cashiers located in several locations supposedly had supplied them. Kornfeld observed that the records of the ticket numbers reflected gaps in the continuity between the closing day of an engagement and the opening day of the next engagement, an indication of unrecorded ticket sales. This occurred only during the period from October 1967 to March 1969 (referred to throughout the testimony as "the bad period"). Such a gap, according to Kornfeld, "is a very strong reflection on the reliability of the records." Kornfeld also noted that only during the "bad period" were there no check marks on the statements indicating the verification of the computations by someone other than the cashier. Kornfeld informed defense counsel of the results of his examination and stated that a proper audit would require the original cashier's box office statements, plus bank statements, duplicate deposit tickets, a cash journal and a general ledger. A few days later, defense counsel informed Kornfeld that Rhyan had recopied the box office statements since the originals had become water soaked and were no longer available.

Shortly thereafter, defense counsel produced bank statements for the four theaters. These statements reflected the daily deposits which each theater made into their separate accounts. The Grayslake Drive-In slips consisted of admissions only, but the other slips contained both admissions and concessions receipts. Kornfeld was shown photostated copies of duplicate deposit tickets from the Liberty Theatre on which certain notations had been blocked out. He was told that these notations pertained to the admissions and concessions and only the total deposit was showing. Kornfeld was given the original duplicate deposit slips for the Drive-In. For the other theaters, he was shown a machine receipt from the bank which showed only the total deposit. Kornfeld observed that something previously had been stapled to each of these receipts, but had since been torn off. On November 25, 1969, Kornfeld notified defense counsel that the ticket breaks occurred between almost every engagement except when the same distributor played two pictures or the same picture two weeks in succession. Kornfeld stated that representatives of the distributors had been sent to the theaters during this time period to buy tickets as a spot check. These tickets did not appear in the box office statements, but instead, their number fell within the unaccounted for gaps. This indicated the sale of unrecorded tickets. Kornfeld also stated that certain performances were entirely unreported.

Pursuant to stipulation of the parties, numerous license agreements for exhibiting films between the various plaintiff distributors and the defendants, along with contracts and business records of plaintiffs were introduced into evidence. The parties further stipulated to the

authenticity of the stamp or signature of Ms. Gallo and that of any of plaintiffs' agents which appeared on the contracts.

Rhyan testified that Gallo negotiated directly with the distributors' agents concerning the reviewable contracts after the film had been shown and the box office reports had been sent to the distributors. Rhyan admitted that he reviewed and signed these box office reports which were based on the cashier's daily box office reports, and contained the admission receipts figures and the opening and closing ticket numbers. Gallo then sent an invoice to Rhyan which contained the amount due in dollar terms for a percentage picture. The percentage figures included on these invoices had no meaning for Rhyan. Rhyan also admitted to have recopied, with the help of his wife, the daily box office reports for the three indoor theaters. The original records had become water-soaked in storage. They recopied the records after receiving the letter in June 1969 from plaintiffs' counsel requesting an inspection. The wet originals subsequently were destroyed. After Rhyan received the recopied work back from Kornfeld, they were disposed of during his move to new offices. Rhyan testified that prior to 1970 the admission receipts and the concession receipts had been lumped together in the daily deposits. A notation was made of each figure on the deposit slip. These figures were masked over and photostated before being shown to Kornfeld. The original records showing this breakdown, along with the cash journals, were among the records destroyed during the move.

Della Gallo testified and described the procedure she used in obtaining the films, which began when a distributor would send her an availability notice concerning a film. She would discuss the feature with Rhyan, and if he requested, would contact the distributor's booking agent or branch manager. Although her testimony is somewhat unclear on this point, it appears that the distributors informed her of the range of the percentage regarding the terms of the picture being discussed. Thus no negotiations concerning terms of the license were entered into at this time. The contract application was then mailed to her containing the percentage range. This form eventually was signed by both parties.

Subsequent to the showing of the film, Gallo negotiated the final terms with the distributors' agents using the profit-loss statements, based on gross admissions, as recorded in the box office statements. While the upward limit of the percentage range was never exceeded, the final figure often was below the lower number initially listed on the contract application. Although the main concern in the negotiations was the gross admissions figure, many other considerations were involved in determining the final terms. These included the performance of that film in other locations, the number of the particular distributor's films which the theater had exhibited recently, expenses, adjustments because of prior

features, and favors between the distributors and Gallo. Invoices were sent to Rhyan depicting the final terms in dollar amounts along with notations as to percentages.

Following the filing of memoranda by both sides, the court, on June 28, 1973, entered an interlocutory order acknowledging plaintiffs' right to an accounting. After a delay caused primarily by defendants' unsuccessful attempt to appeal the trial court's interlocutory order and also to give Kornfeld an opportunity to examine defendants' books of account, the hearing to determine distributors' damages for fraudulent underreporting of defendants' gross admission receipts began on July 22, 1974.

Kornfeld testified about the various exhibits which he had prepared from defendants' own records. They had produced all requested records pertaining to the period of August 1968 to August 1973 including cash journals, ledgers, and other books of account. As revealed at the earlier hearing, the records for October 1967 through July 1968 had been recopied by Rhyan and then destroyed. Kornfeld's exhibits attempted to ascertain: the gross receipts reported to the distributors; the actual amount taken in by the theaters; and the resultant unreported difference. Kornfeld attempted to calculate the unreported difference during the period without records by formulating an average of admission receipts compared to total receipts over an extended period of time. This ratio was verified by checking its accuracy when applied to periods where the full records were available. When that ratio was multiplied times the total bank deposits, a fair estimation of admission receipts should have resulted. Kornfeld also illustrated underreporting at the drive-in theater through use of unreported "passes." Adding the above unreported grosses should present the total of unreported gross admission receipts from the four theaters for the entire period of the litigation.

Kornfeld explained his exhibits column by column. The first column contained the gross box office receipts as reported to the distributors, and defendants stipulated that these figures were accurate. To arrive at the calculation of the unreported gross in the third column, he subtracted the amount in the first column from the audited or "true" gross receipts listed in the second column. Kornfeld used three methods in determining the actual daily cash box office receipts. The first was to extract the proper figures from defendants' own books. The cash journals of the three indoor theaters reflected approximately 100 instances of underreporting. As to the period for which defendants' books had been destroyed, Kornfeld determined an average between admissions and concessions receipts based on a 10-month sample period in 1967. He found that the average ratio of theater admissions to bank deposits amounted to 80.5% at the Antioch Theatre, 81% at the McHenry Theatre, and 81.6% at the Liberty Theatre. Kornfeld then multiplied these ratios times the respective daily

bank deposits of each theater to ascertain the gross admission receipts. These ratios had been tested during periods which could be verified using the cash journals. A close correlation was shown to exist. The third method involved only the drive-in theater from 1970 to the date of the trial. The cash journal contained a new column as of August 4, 1970 entitled "passes." The number contained in this column reflected the receipt of cash for tickets sold at regular prices. Although this income was recorded in the cashier's daily box office reports, the cash journal and the ledger, it was never reported to the distributors involved.

Defendants introduced an exhibit showing the variance of concession ratios to box office receipts for the different pictures. For purposes of illustration, 10 examples were used for each of three outdoor theaters. The examples did not reflect any one period, but were taken from exhibitions throughout 1970 to 1973.

Defendants called as witnesses four of the nine branch managers of the plaintiff distributors' Chicago offices who testified to the basis of the determination of the final terms of the license fees. Their testimony indicated that the determination of final terms varied from picture to picture, based primarily on the gross receipts, although other considerations existed. One of the witnesses testified that a rule of thumb was that for every three to four percent change in gross, there is a corresponding one percent change in the final film rental terms. Branch managers from the other five distributors were not called pursuant to stipulation, the pertinent part of which is as follows:

> " '* * * that if the branch managers of the aforementioned plaintiffs were called to testify, they would testify that had higher grosses been reported to them in connection with the pictures which are the subject matter of this proceeding, the settlements that would have been negotiated would have been at a higher percentage. But they would have been unable to testify as to the specific percentage as to any specific picture involved in this proceeding.' "

On October 28, 1974, the court, following receipt of memoranda from both sides, announced its decision in favor of plaintiffs. On November 6, 1974, the court entered judgment as set forth earlier in this opinion. On January 3, 1975, the court awarded fees and costs under section 41 of the Civil Practice Act.

Defendants' extensive allegations that error occurred in the trial court may be grouped into four primary areas: procedurally, that joinder of plaintiffs was improper, resulting in prejudice to defendants; that proof was insufficient to sustain the findings against them; that the damages were incorrectly calculated; and that the award of fees and costs under Section 41 was improper.

■■ Defendants first contend that plaintiffs were improperly joined in one suit, resulting in prejudice to each defendant. Joinder of plaintiffs is permitted under section 23 of the Civil Practice Act when the various actions arise out of the same action or series of transactions, and when common questions of law or fact are involved. (Ill. Rev. Stat. 1973, ch. 110, par. 23; *Rodriguez v. Credit Systems Specialists, Inc.* (1974), 17 Ill. App. 3d 606, 308 N.E.2d 342.) The statute is to be construed liberally in favor of joinder of plaintiffs when possible. (*Baumgardt v. Isaacs* (1963), 29 Ill. 2d 29, 193 N.E.2d 31.) In *Baumgardt* the court stated at pages 35-36 that section 23 "* * * is regarded by most authorities as having generally adopted the previous equitable procedure of allowing all plaintiffs seeking relief of the same general character to join in all cases that could be more conveniently tried in a single suit, unless the defendant is unreasonably prejudiced thereby."

■■ In the present case, common questions of both law and fact are involved. The similarity of the contracts and procedures used by each plaintiff distributor in dealing with defendants presents questions of law applicable to all plaintiffs. Moreover, the negotiations through Gallo and the resultant agreements and actions of the parties established a relationship which would require honest reporting of grosses to each distributor by the exhibitor. Inherent in this relationship was the right to check the reported figures against defendants' own records. Plaintiffs' lawsuits also were tied together factually. To prove the case of any individual plaintiff would have required the entire books and records of each defendant. To determine the unreported gaps in the tickets sold, the individual plaintiff would have to prove what films other distributors had been offered before and after its exhibition. The testimony in each case, particularly that of the principal witness Kornfeld, would have been repetitive.

We also believe that the actions arose out of the same transaction or a series of transactions, and that the contractual agreements involved in the present case are conducive to joinder. The court and the parties all would incur considerable additional expenses if nine trials, containing much of the same proof, had to be undertaken. The transactions are related for several reasons. Rhyan was the controlling owner of all defendants throughout the entire period. It was his actions of nonreporting of tickets which had been sold that precipitated the controversy. Rhyan never did this when the same distributor exhibited features on consecutive weeks. Rather, he waited until a different distributor showed its films to withhold ticket sales. Thus in nine suits, it would be difficult for a court to determine the relationship of the reported grosses to the actual sales. Each breach involved at least two distributors, and it would be impossible for a court to separate the transactions involved.

Defendants maintain, however, that they were prejudiced by the joinder since it commingled both the issue and the proof resulting in liability and damages being established as though the matter was being tried on the theory of joint accountability. The simple answer to this argument is that joinder was required by defendants' own acts. Rhyan's withholding and destruction of evidence, and failure to report receipts made it impossible to view each claim separately. If there was confusion and resultant prejudice, it was not caused by joinder but by Rhyan's conduct.

■■ Defendants further contend that they were prejudiced by the joinder in that it deprived them of their constitutional right to a jury trial. While it is true that a procedural matter aimed at convenience and expedience, such as joinder, cannot act to deprive a defendant of his right to a jury trial (*Beacon Theatres, Inc. v. Westover* (1959), 359 U.S. 500, 3 L. Ed. 2d 988, 79 S. Ct. 948) it is clear in the present case that the chancery division properly would have assumed jurisdiction even if there had been no joinder. A court will exercise jurisdiction for the purpose of ordering an accounting: when discovery is necessary; when complicated or mutual accounts are involved; or when a fiduciary relationship exists between the parties (*Lorsch v. Gibraltar Mutual Casualty Co.* (1970), 127 Ill. App. 2d 350, 262 N.E.2d 313). In *Lorsch* the court also commented that the existence of numerous accounts contributes to the complexity of the accounting which must be "beyond the ken of average jurors" so as to confer equitable jurisdiction. Without reviewing the facts already set forth in this opinion, it is clear that the complexity of discovery and complicated and numerous accounting problems reveal that the chancery division's assumption of jurisdiction was proper. Although the facts strongly suggest that defendants were in a fiduciary position regarding the money they collected, we see no reason to examine that additional factor as a basis for equitable jurisdiction.

■■ Defendants' next group of contentions is that the proof was insufficient for the trial court to rule in favor of plaintiffs. We first note that defendants' own records conclusively establish that underreporting of proceeds to the distributors occurred. Kornfeld's unrebutted testimony revealed the discrepancies in the indoor theaters for the periods where cash journals and ledgers were available as well as where the records had been recopied and then destroyed. Thus the proof with regard to defendants' underreporting is overwhelming.

Defendants, however, claim that no binding agreements were entered into between themselves and the plaintiff distributors. They acknowledge that negotiations occurred through Gallo, that terms were agreed upon for licensing of the films, that the films were exhibited, that grosses were calculated and reported to plaintiffs, and that a percentage of those

grosses was paid to plaintiffs as fees. Final negotiations as to what percentage of gross receipts would constitute the license fee were entered into after the showing of the film, and were based primarily upon the amount of the grosses. This was established by the testimony of defendants' own agent. Written contracts for each such agreement were produced. The final modifications of the percentage term were negotiated by agents of the parties. These modifications were submitted to the home office for written verification. Rhyan testified that Gallo would not agree to final terms without his express assent. Thus the essential elements required for a contract were present. Similar agreements have been held to be binding between distributors and exhibitors. (*Metro-Goldwyn-Mayer, Inc. v. ABC-Great States, Inc.* (1972), 8 Ill. App. 3d 836, 291 N.E.2d 200; *Twentieth Century-Fox Film Corp. v. Woods Amusement Corp.* (N.D. Ill. 1969), 304 F.Supp. 23.) The contracts were completely performed by both sides except that defendants failed to report the actual grosses. The contractual obligations were breached clearly and repeatedly.

Defendants further contend that the judgment must fail because plaintiffs neither pleaded nor proved fraud. Although fraud must be specifically alleged in the pleadings (*Zickur v. Irmiger* (1973), 15 Ill. App. 3d 805, 304 N.E.2d 635), use of the conclusionary word "fraud" is not necessary. (*Metropolitan Sanitary District v. Pontarelli & Sons* (1972), 7 Ill. App. 3d 829, 288 N.E.2d 905.) What is important is that the opposite party be sufficiently apprised of what he is called upon to answer. (*Davis v. Nehf* (1973), 14 Ill. App. 3d 318, 302 N.E.2d 382.) The essential elements of an action in common law fraud are that there must be an untrue statement of material fact believed and relied upon to his detriment by the party to whom the statement is made, and that the untrue statement was made for inducing the other party to act. *Broberg v. Mann* (1965), 66 Ill. App. 2d 134, 213 N.E.2d 89.

■■ Defendants knowingly and repeatedly reported untrue grosses to plaintiffs. This was proved by the records and corroborated by the investigators sent to the theaters. The distributors had to accept these figures as true to calculate their income from the license agreements. Defendants realized this and continued their deception. The distributors were injured in that their percentage of the lower false grosses, even when calculated from the original negotiated terms, was diminished. They were further damaged in that the primary determinant, although admittedly not the sole one, of the final negotiated percentage was the amount of the grosses. Thus the distributors received a diminished percentage of the lower grosses. We find the evidence is sufficient to support a finding of fraud against defendants. See *L.C.L. Theatres v. Columbia Pictures Industries, Inc.* (N.D. Tex. 1976), 421 F. Supp. 1090.

■■ We find no merit in defendants' claim that plaintiffs' suit should have been dismissed because of laches. The delays were not unreasonable and, more importantly, were occasioned by defendants' lack of cooperation in producing their books and records. Moreover, defendants have failed to demonstrate that they have been prejudiced by the delays. *Boner v. Drazek* (1973), 55 Ill. 2d 279, 302 N.E.2d 280.

Defendants next contend that the trial court incorrectly calculated damages, resulting in an unfairly high award. They also maintain that the award of prejudgment statutory interest to plaintiffs was erroneous. We note here that plaintiffs have filed a cross-appeal, contending that the damages awarded were inadequate.

The exact computation of damages in this case is impossible. Records have been recopied and destroyed. The precise amount of concessions receipts was known only to defendants, and no one can say with certainty what the final negotiated percentages would have been had the true grosses been reported. The cause of this uncertainty rests solely on the actions of defendants. A similar problem faced the court in *L.C.L. Theatres v. Columbia Pictures Industries, Inc.* (N.D. Tex. 1976), 421 F. Supp. 1090. There, the court listed a number of related doctrines, as compiled by Professor McCormick (McCormick on Damages §26, at 100-101 (1935)) stating the controlling standard for measuring sufficiency of damage proof in such instances:

"(a) If the fact of damage is proved with certainty, the extent or amount may be left to reasonable inference.

(b) Where the defendant's wrong has caused the difficulty of proof of damage, he cannot complain of the resulting uncertainty.

(c) Mere difficulty in ascertaining the amount of damage is not fatal.

(d) Mathematical precision in fixing the exact amount is not required.

(e) If the best evidence of the damage of which the situation admits is furnished, this is sufficient." 421 F. Supp. 1090, 1102.

■■ In the present case, three theories of damage awards were submitted to the trial court. Defendants asked that the final terms be applied to the new grosses. The court correctly rejected this proposal as clearly being unfair to the distributors. The plaintiffs sought use of the terms which they gave to defendants prior to the negotiations. The court also rejected this theory as a penalty. The court, instead, attempted to approximate the percentage which would have been reached had the true grosses been reported. To this end, extensive exhibits had been submitted to the court showing that the final percentage terms would have increased an average of 20% had the true grosses been reported. The court accepted

these calculations as well as the trial testimony of Kornfeld in attempting to establish the extent of the unreported grosses. The averaging technique introduced by the plaintiffs appears to be the best method of establishing the true damages. The trial court was in the best position to evaluate the computations, the auditor's testimony, and the fairness of these figures. Although not exactly precise, those calculations formulate a reasonable estimation of the extent of damages sustained by plaintiffs. They have enabled the trial court to award each distributor a close approximation of the monies due them. Thus we accept the trial court's calculation of damages, and we reject both plaintiffs' and defendants' challenges to them.

■■ Defendants also challenge the trial court's judgment allowing interest of five percent per year on the payment of the license fees which had been vexatiously and unreasonably delayed. Interest of $12,372.72 was computed from the date on which the monies were due until the date of judgment pursuant to statute. (Ill. Rev. Stat. 1973, ch. 74, par. 2.) Based on the aforementioned underreporting, we agree with the trial court that this interest should be assessed. Such matters as those involved here have previously been found to fall within the purview of the meaning of such statutes. *Twentieth Century-Fox Film Corp. v. Woods Amusement Corp.* (N.D. Ill. 1969), 304 F. Supp. 23; *L.W. Foster Sportswear Co. v. Goldblatt Bros.* (7th Cir. 1966), 356 F.2d 906.

Defendants finally argue that the trial court incorrectly assessed costs and attorneys' fees, totalling $19,500.00, pursuant to section 41 of the Civil Practice Act (Ill. Rev. Stat. 1973, ch. 110, par. 41).

Section 41 of the Civil Practice Act gives a party the right to recover reasonable expenses and attorneys' fees from an offending party which fees and expenses were incurred by reason of the untrue pleadings, made without reasonable cause and not in good faith, filed by the offending party. The allowance of counsel fees and expenses under section 41 is an attempt to penalize any litigant who pleads false matters and thereby puts an undue burden on an opponent to expend money in order for his attorney to disprove such pleadings. *Lipscomb v. Coppage* (1963), 44 Ill. App. 2d 430, 197 N.E.2d 48.

Paragraph 7 of plaintiffs' amended complaint in each of counts I-V reads as follows:

"7. Defendant produced a portion of its records for said audit but refused to produce all of the requested records. The partial records produced revealed that for the period of October, 1967 to March, 1969 defendant had knowingly and deliberately underreported gross receipts to plaintiffs in an amount in excess of $50,000. Despite repeated demands defendant, in violation of its

fiduciary duty, failed to produce its remaining records for examination and failed and refused to pay the amount due each plaintiff."

Defendants' answer upon which the court based its award was as follows:

"7. Answering ¶7, defendant states that it produced all of the records required by it to be produced, pursuant to the demand of plaintiffs, for the period October 1967 to March, 1969, and denies that it is required to produce any other or further records. Defendant affirmatively states that the records that it refused to produce were records which it was contractually obligated to produce for each of the plaintiffs. Defendant denies the remaining allegations of ¶7, except that plaintiff [sic] admits that it failed and refused to pay any additional amounts to each plaintiff and affirmatively states that no amount is due to each plaintiff from defendant."

The order awarding section 41 costs went on to recite that: "the Court finds that for said period defendant did knowingly and deliberately underreport gross receipts to plaintiffs in an amount in excess of $50,000 and that defendants' own records do and did show said knowing and deliberate underreporting of gross receipts to be the fact."

■■ The trial court's own finding reveals that the answer filed by defendants was not false. It showed that each defendant had denied knowingly underreporting gross receipts to plaintiffs in excess of $50,000.00 The complaint never suggested that *each* defendant had underreported gross receipts in that amount. The amended complaint sought a total of $126,039.00 from all defendants. The court erroneously found that the entire aggregate underreporting of *all* defendants would support a finding under section 41, and therefore we believe that order must be reversed.

For the reasons stated, the judgment of the circuit court of Cook County awarding plaintiffs $79,290.63 plus interest in the amount of $12,372.72 is affirmed. The order awarding plaintiffs costs and attorneys' fees under section 41 is reversed.

Affirmed in part.
Reversed in part.

JIGANTI and McGILLICUDDY, JJ., concur.