NOTICE
Decision filed 12/10/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 231239-U

NO. 5-23-1239

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| TROY ERLENMEYER, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Washington County. |
| | ) | |
| v. | ) | No. 21-L-14 |
| | ) | |
| HOLZHAUER AUTO & TRUCK SALES, INC., | ) | |
| a/k/a Holzhauer Auto & Motorsports | ) | |
| Group, | ) | Honorable |
| | ) | Daniel J. Emge, |
| Defendant-Appellee. | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Boie and Sholar concurred in the judgment.

**ORDER**

¶ 1     *Held*: The trial court correctly granted defendant's motion for judgment where insufficient evidence of damages was presented at trial.

¶ 2     Plaintiff, Troy Erlenmeyer, appeals from the trial court's order granting the motion for judgment requested by defendant, Holzhauer Auto & Truck Sales, Inc. (Holzhauer), following Troy's submission of his case-in-chief. On appeal, Troy argues that the trial court's finding that he failed to submit sufficient evidence on the issue of damages was contrary to law and was further hampered by erroneous evidentiary rulings. For the following reasons, we affirm.

1

¶ 3                       I. BACKGROUND

¶ 4     Around 5 p.m., on December 31, 2019, Troy stopped by Holzhauer's to look at a 2004 Ford Escape with his wife and son. After finding the 2004 vehicle was not to his liking, Troy and his family started to leave. They were approached by a Holzhauer salesman who offered to assist them in finding a different vehicle. The salesman described one vehicle on the lot as a 2011 Ford Escape and, upon Troy's request, provided a Carfax for the vehicle. The Carfax history revealed one prior owner and no accidents. Troy took the 2011 Ford Escape vehicle for a test drive and decided to purchase the vehicle. While the parties were completing the paperwork, the sales manager popped his head in and told him he was "actually getting a better deal than we all thought *** the vehicle was actually a 2012."

¶ 5     Troy did not request a Carfax for the 2012 vehicle. The 2012 Ford Escape price was $8500.13. The amount was increased by $184.81 in document fees, $544.06 in sales tax, and $251 in title fees for a total of $9500. Troy provided $3500 as a down payment reducing the unpaid balance to $6000.13. When Troy financed the vehicle, he purchased a vehicle warranty protection plan for an additional $2280 and financed $8280 at 11.99% interest. The finance charges added an additional $2823.60, resulting in a total amount due under the installment agreement of $14,603.60. Troy's wife drove the vehicle home.

¶ 6     Approximately 18 months later, Troy explored the possibility of trading in the 2012 Ford Escape. On July 1, 2021, Troy obtained a Carfax on the vehicle he purchased from Holzhauer. According to the Carfax, the vehicle had four previous owners, one of which was a rental company, and was involved in two accidents that were classified as "minor." The 2021 Carfax also provided a trade-in value of $4810 for the vehicle.

¶ 7     On November 10, 2021, Troy filed a complaint against Holzhauer alleging violations of the Illinois Consumer Fraud and Deceptive Business Practices Act (Act). The complaint alleged that Troy purchased a 2012 Ford Escape from Holzhauer on December 31, 2019, for $14,603.60, and that Holzhauer violated the Act by representing the 2012 Ford Escape as a one-owner vehicle with no accidents when it had four previous owners and two prior accidents. Troy alleged that he relied on the salesman's representation regarding ownership and accidents in purchasing the vehicle and that the fair market value of the 2012 Ford Escape he purchased was less than $2000 based on the vehicle's history. Troy claimed that he was damaged in an amount exceeding $10,000 and requested payment of his attorney fees that he alleged exceeded $20,000. Troy further alleged that Holzhauer's conduct was "outrageous, willful, wanton, unjustified, malicious and in conscious disregard of the rights of others" warranting punitive damages greater than $100,000.

¶ 8     On December 14, 2021, Holzhauer filed an answer denying most of Troy's allegations. On January 9, 2023, Troy filed a motion for a trial setting. On January 12, 2023, Holzhauer filed a response agreeing that a trial date should be set and requesting a case management order. Following a hearing on February 9, 2023, the trial court issued a case management order setting the matter for trial on November 13 and 14, 2023. The order required disclosure of Troy's lay and expert witnesses by April 3, 2023, and to make them available for deposition by May 3, 2023. Holzhauer was required to disclose its lay and expert witnesses by June 5, 2023, and make its experts available by July 5, 2023. Troy's rebuttal witnesses were required to be disclosed by July 12, 2023, and he was to make those witnesses available for deposition by July 26, 2023. Discovery was to be completed by August 1, 2023, with any dispositive motions due by August 31, 2023. A pretrial conference was scheduled for October 6, 2023.

¶ 9     Troy's April 3, 2023, witness disclosure listed Jacob Brown as his expert witness. On June 23, 2023, Holzhauer filed a motion for summary judgment claiming no issue of material fact existed and plaintiff could not show deception. On July 28, 2023, Troy filed a motion for additional time to respond to the pleading. In addition to stating why the continuance was necessary, the pleading alleged that his expert witness, Mr. Brown, was no longer available. The pleading asserted that Troy needed to retain an expert witness on the decrease in value resulting from the previously undisclosed owners and collisions. The motion requested an extension until August 15, 2023. On August 1, 2023, the trial court issued an order granting the extension to file the response to the motion for summary judgment and obtain an expert witness until August 15, 2023.

¶ 10    Troy filed his response to the motion for summary judgment on August 11, 2023, arguing that summary judgment was inappropriate because there were numerous unresolved issues of material fact related to Holzhauer's deception. On September 1, 2023, Holzhauer filed its reply. The reply argued that in addition to Troy's inability to show deception, Troy could not show that he suffered any damages. As to the latter claim, Holzhauer argued that Troy disclosed Mr. Brown as his expert witness on April 4, 2023, Holzhauer requested deposition dates, but none were ever provided, and on July 28, 2023, Troy disclosed that Mr. Brown was unavailable to testify. Holzhauer alleged that without an expert, damages could not be proven.

¶ 11    On September 8, 2023, Troy filed a motion for leave to identify an expert witness on damages, identifying Greg Willbanks as his expert for this issue. The motion provided Willbanks's qualifications and stated that a written report would be provided by September 18, 2023, and Willbanks would be made available for deposition.

¶ 12　The parties argued the motion for summary judgment on September 27, 2023. Following the hearing, the court denied the motion. No copy of the transcript is in the record on appeal and therefore it is unknown if the motion for leave to identify the expert witness was addressed.

¶ 13　On October 4, 2023, Holzhauer filed an objection to Troy's motion for leave to name an expert. The pleading noted that Troy's request for extension of time addressed both the motion for summary judgment and his lack of expert. Despite receiving the extension of time, Troy did not disclose any expert by August 15, 2023. Holzhauer argued that Troy's request was contrary to the mandate that all discovery be completed 60 days prior to the trial (Ill. S. Ct. R. 218 (eff. Feb. 2, 2023)) and failed to provide the required information under Illinois Supreme Court Rule 213(f)(3) (eff. Jan. 1, 2018) for expert witnesses. On October 5, 2023, Troy filed a reply that included Willbanks's report, stated Willbanks would be available for deposition, and that no prejudice arose to Holzhauer. Willbanks's report was dated October 2, 2023. The report found the value of the 2012 Ford Escape at the time of sale was $7842 and its value would have been $12,450 if the vehicle history had one owner and been accident-free.

¶ 14　On October 16, 2023, Troy argued his motion for leave. The court asked why the witness was not timely disclosed and Troy's counsel stated, "There was just an oversight, Your Honor. I didn't contact him initially. We were working on the summary judgment motion, and it is my oversight." Holzhauer's counsel argued that granting the request would be contrary to the case management order, as well as the supreme court rules. In response, Troy's counsel stated he would request the trial be rescheduled for two months later, if necessary. Holzhauer stated that Troy was "moving the goalpost," because he did not have sufficient evidence to prove his case, and granting the motion would punish Holzhauer for no reason.

¶ 15     The court stated that it had "a problem" with Troy's oversight argument noting that it previously provided Troy with additional time to retain his expert, the expert was not timely retained, and the trial was set in 30 days. The court found that Troy "has no good reason to be requesting this" and denied the motion stating that if it "were to allow this to go it is very prejudicial to the Defendant." The court also stated that it would not likely grant any request for continuance of the trial date.

¶ 16     The bench trial was held on November 13, 2023. Troy testified that he was looking for a new motor vehicle on December 31, 2019. He saw that Holzhauer had a white 2004 Ford Escape on the Internet and went to see it after obtaining $3500 from the bank. He went straight to the vehicle and saw that it was not what he wanted. He was approached by Tanner Pitts as he was leaving. Tanner started discussing another vehicle on the lot, which was silver, but was likely out of Troy's price range. Tanner stated it was a one-owner vehicle that was well maintained. Tanner and Troy test drove the vehicle. Troy was later provided a Carfax for a 2011 Ford Escape. He stated that the 2011 Ford Escape Carfax set forth a vehicle history of one owner, clean title, and no accidents. Troy talked to Tanner about the downpayment and his $9000 financing limit. Tanner then went to talk to his manager, and thereafter, they started the paperwork.

¶ 17     Troy identified the sales agreement that originally said 2011 but was "written over with a 2 to make it a 2012." He said the change occurred while they were signing the paperwork. He stated that the sales manager popped his head in and told him he was "actually getting a better deal than we all thought *** the vehicle was actually a 2012." The finance manager changed the 2011 to state 2012 on the sales agreement. There was no discussion about a Carfax after Troy was told the car was a 2012, not a 2011.

6

¶ 18    Troy also identified the finance paperwork. He agreed that he provided a $3500 down payment. The odometer was listed at 90,587. He stated that he was not given the copy of the 2012 Carfax when he purchased the car. He testified that the vehicle history with one owner and no accidents was important to him and what he looked for on the Carfax. He stated that he relied on the Carfax in making his decision to purchase the vehicle. He testified that his wife drove the 2012 vehicle home and confirmed that the vehicle he purchased was the same vehicle he discussed and test drove with Tanner.

¶ 19    Troy stated that he later explored the possibility of trading in the 2012 Ford Escape. On July 1, 2023, Troy became aware of the Carfax on the vehicle he purchased and learned things about the vehicle he did not know when he purchased it. The 2012 Ford Escape had four previous owners, one of which was a rental company, and was not accident-free. Troy asserted that he would not have purchased the vehicle if he had that information prior to purchasing. Holzhauer objected when Troy was asked if he had an opinion about the fair market value of the 2012 Ford Escape as it existed on the Carfax. The question was stricken. Troy was then asked if he had an opinion related to the fair market value of the vehicle and said, "Yes." He then testified that the basis of his opinion was that he had "extensive mechanical background and to me a vehicle with this much history is basically just a basic running driving vehicle and at that point it is only worth about $2000." Upon Holzhauer's request, the response was stricken. Troy was asked to tell the court solely about his experience in buying and selling vehicles. He stated that after the first few cars were purchased by his parents, he did it alone. He would purchase a vehicle based on his mechanical knowledge and experience professionally and that was what he went by as far as valuing vehicles and whether he was going to purchase it. He stated that the vehicle's need for

7

maintenance was also important in determining whether he was willing to take the risk on the vehicle.

¶ 20    Troy was also asked about online purchasing and an objection was raised. Holzhauer quoted Troy's deposition testimony after he was asked if he had any experience in professionally buying and selling vehicles. Troy responded, "I am not going to claim to be a professional at buying and selling vehicles, sir." He also stated that he had no other experience than occasionally buying a vehicle like most people. The court allowed Troy to continue to testify as to the basis of his valuation. Troy stated that he had purchased or sold approximately 20 vehicles. He stated that he browsed vehicles all the time and was always looking out of curiosity to see where prices were and if he wanted to trade in a vehicle. He stated that he browsed eBay, Carfax, and car sales websites. He liked older vehicles and was always looking to see what was available.

¶ 21    Troy's counsel submitted that Troy's testimony was sufficient to allow Troy to provide his opinion for the car's value. Holzhauer's counsel objected, stating that Troy's opinion related to the value of the car was never disclosed, and Troy testified during his deposition that he had no experience in valuing a vehicle. Holzhauer further argued that Troy never supplemented his discovery to state otherwise and claimed Troy was trying to get around the court's prior rulings related to experts. The court found that Troy did not have "the necessary, experience, training, [or] knowledge *** to testify as an expert as to the value of this vehicle." It stated that Troy could testify as a lay person and the issue as to that evidence would be weight, not admissibility. However, the court stated it would not allow Troy's opinion based on a forensic valuation without being an expert, and therefore precluded Troy from providing a value for the vehicle at the time of purchase based on information received in the meantime.

8

¶ 22 Troy's counsel then made an offer of proof. He stated that if Troy was permitted to testify, he would testify that the fair market value of the vehicle as it existed at the time it was purchased was $2000. Troy was then asked if his opinion on the value was based on the Carfax. Another objection was raised and sustained. Troy was then asked what fair market value was and he responded saying that the term would include

> "the year of the vehicle, the amount of owners, the condition of the vehicle, and all things involved as far as 'drive ability,' [*sic*] the way it handles. All conditions factored in would be what you would be willing to purchase it for. Your maximum top dollar what you would be willing to purchase for. That would be my opinion."

¶ 23 Troy testified that the vehicle, as presented to him by Tanner, had a value of $13,000, which was approximately what he paid for the vehicle. He opined that the vehicle he purchased, as it existed, was worth less than the $13,000. He confirmed that he still owned the 2012 Ford Escape.

¶ 24 On cross-examination, Troy agreed that the car he purchased was a 2012. He also agreed that the price of the car was $8500 and adding everything else took it up above $11,000. He stated that he was not told that he was purchasing a 2012 until he was signing the paperwork, and the dealership was in a hurry to close. He agreed that it was his decision to proceed with the sale and that every piece of paper related to the deal said 2012. He further agreed that once he found out he was not purchasing the 2011 vehicle, and was instead purchasing a 2012 vehicle, he did not ask for a Carfax. When asked if Holzhauer made any misrepresentations to him about the 2012 vehicle, Troy stated that they "misled me to believe it was a 2011." Troy agreed Holzhauer made no representations to him about the 2012 vehicle and never said how many previous owners were connected to the 2012 vehicle or if the vehicle was involved in any accidents. He agreed that all the documentation stated 2012. He also agreed that he could have gone online while he was at the

9

dealership and gotten a copy of the Carfax for the 2012 vehicle. He confirmed that he did not request a copy of the Carfax from Holzhauer while he was at the dealership or the next day and stated that he did not do so because "he believed they were reputable." Troy further agreed that he did not look up the Carfax online a week or even a month after he purchased the vehicle. He agreed that aside from the 2012 Carfax, there was no evidence that the vehicle was not a well-maintained vehicle. He also agreed that he was not a professional at buying and selling vehicles and had no work experience buying or selling vehicles where he was required to value the vehicle. He stated the vehicle currently had between 135,000 and 145,000 miles.

¶ 25 On redirect, Troy clarified that he test drove the 2012 vehicle, believed it was a 2011 vehicle when he drove it, and bought the same vehicle that he drove. He asked for the Carfax on the car that he drove and was provided the Carfax for the 2011 vehicle. The Carfax was not for the vehicle he purchased. He did not obtain the Carfax for the 2012 vehicle until he was considering trading it in. It was then that he learned of the prior owners and accidents. He was never provided a Carfax for the 2012 vehicle. He stated he would not have purchased the vehicle if he had been provided that information.

¶ 26 Anthony Hopkins was called as an adverse witness. Mr. Hopkins worked at Holzhauer's as the finance manager on December 31, 2019, and that remained his current position. He prepared the paperwork for Troy's purchase. He did not know if Troy received a Carfax for the 2012 Ford Escape. He did not know if Troy requested a copy of the Carfax for the car he was buying. He did not have any opinion on the fair market value of the vehicle, whether it had no accidents with one owner or two prior accidents with four previous owners.

¶ 27 On cross-examination, Mr. Hopkins confirmed that Troy signed the documents for the purchase. He was familiar with the National Automobile Dealers Association (NADA). He agreed

10

that NADA stated the wholesale value for a 2012 Ford Escape was $7425, and the retail value was $10,050. Mr. Hopkins confirmed that Holzhauer sold the vehicle for $8500.

¶ 28    On redirect, Mr. Hopkins stated that he had no opinion as to the value of Troy's car. He stated that the number of owners did not mean anything for value on Carfax. He did not know how much Holzhauer paid for the 2012 Ford Escape.

¶ 29    Jeffrey Miller testified that he was previously employed at Holzhauer and retired from employment on December 31, 2019, after working there for almost 29 years. He was the sales manager for 17 years. He had no recollection of the day Troy purchased the car other than packing his box to go home. He believed Tanner Pitts was the salesman but was not 100% sure. He did not recall if Troy was originally purchasing a 2011 vehicle, and it was later pointed out that it was a 2012 vehicle. He stated that Holzhauer did rely on the Carfax to evaluate cars to buy and sell. He was asked about the car's fair market value, but Holzhauer's objection was sustained. He did not know the price Troy paid for the car or the mark up on the vehicle. He did not know if Holzhauer had a Carfax for the 2012 vehicle. He said they did not use Carfax for trade value. They used Kelley Blue Book, Edmunds, or something off the Internet. He was unsure if Internet auction prices incorporated the number of owners but thought they might. He said it was not standard practice for Holzhauer to factor in the number of prior accidents or number of owners. However, such practice would be followed occasionally, depending on the vehicle, but the value did not usually change based on the number of owners. He said the accidents were not insignificant, but they looked at other information in valuing the car. He agreed that a one-owner car was easier to sell than a four-owner car. On cross-examination, Mr. Miller stated he did not know the original asking price for this car. Holzhauer advertised a price, and customers would negotiate about 90 percent of the time.

11

¶ 30    Brock Baldwin was employed at Holzhauer's as a sales manager. He replaced Mr. Miller on January 1, 2020. He agreed that he had a role in valuing some of the cars on the Holzhauer lot. He stated that Holzhauer did not use Carfax to value the car; they only used it to determine whether the vehicle had a salvage or regular title. He stated that with some people, it would matter how many owners there were, but each person had different criteria when purchasing a car. Not everyone asked for a Carfax. There was no telling who might want to see a Carfax. Some people wanted to know how many previous owners and accidents were associated with the vehicle, but others did not. If a person asked for the Carfax, Holzhauer provided it. Holzhauer only used the Carfax to see if the vehicle was totaled or if the customer requested one. They did not look at the Carfax to value every car. It depended on the car. If it was new and low miles, they would pull a Carfax to determine prior accidents, flood, fire, repossessions, or if it had been stolen. He did not know if a Carfax was used to value the 2012 Ford Escape, but since it only had 90,000 miles on it, they would probably look to see if there were any accidents and how severe they were.

¶ 31    Mr. Baldwin explained that Carfax listed a "new owner" simply if a name was changed or a lien was released and therefore Holzhauer did not rely on Carfax for ownership because there was no way to differentiate. He stated he had no way to go back to 2019 to determine the fair market value of the Ford Escape at that time. He said the number of owners and accidents for the 2012 Ford Escape did not alter the value. He did not use the Carfax to value a car. He would value the car by driving it. He did not think the trade-in value of a vehicle would change based on the ownership and accident record if everything was okay with the vehicle. The retail value was no more than what a consumer was willing to pay for the vehicle. If they drove it, liked it, they may or may not purchase the vehicle. Each person was different. He stated that there was no difference in the fair market value of the vehicle with 90,587 miles if it had one previous owner and no

12

accidents as opposed to one that had four owners, including a car rental company, and two previous accidents. He confirmed that he could not determine the fair market value of the 2012 Ford Escape in 2019, nor could he determine the fair market value of the vehicle now.

¶ 32    On cross-examination, Mr. Baldwin stated that if a customer requested a Carfax, one would be provided. He stated there was only one 2011 Ford Escape on the Holzhauer lot on December 31, 2019. That vehicle had 125,087 miles. It was reported stolen on November 16, 2011, with damage reported on October 13, 2011. As of December 31, 2019, Holzhauer did not have a 2011 Ford Escape with a Carfax that indicated no damage.

¶ 33    Michael Haselhorst worked as a sales manager, under Brock Baldwin. He was not involved with Troy's transaction. He agreed that the Carfax, and any prior accidents seen on it, was to advise the purchaser of that information. He stated that the number of accidents or owners could affect the price of a vehicle. However, he did not take them into consideration when he priced a vehicle. He said that was because not every customer was concerned about that information. He stated that the number of owners or accidents would affect the price depending on the customer. Some did not care about that information. He could not state that a vehicle's fair market value would be greater with a one-owner, no accident vehicle or a four-owner, two-accident vehicle, history because it would depend on the purchaser.

¶ 34    Following Mr. Haselhorst's testimony, Troy's counsel submitted an exhibit with his attorney fees. He admitted the exhibit was not provided to opposing counsel prior to the day of the hearing. The court took the matter under advisement and stated that it would allow Holzhauer's counsel additional time to review the exhibit.

¶ 35    Troy's attorney requested the opportunity to make an offer of proof regarding Greg Willbanks's testimony. Counsel stated that if Mr. Willbanks were to testify, he would state that

13

the fair market value of the vehicle as represented to Troy was $12,450 and the fair market value as it existed when it was purchased was $7842. Thereafter, plaintiff rested.

¶ 36    Holzhauer's counsel moved for judgment pursuant to section 2-1110 of the Code of Civil procedure (735 ILCS 5/2-1110 (West 2022)). Holzhauer argued that no deception was evident, and plaintiff failed to show damages. As to the latter issue, counsel argued that Troy was unable to establish the fair market value of the car through professional testimony. The only third-party evidence revealed the value was somewhere between $7500 wholesale and $10,050, so there was no evidence that this car had any value lower than the selling price.

¶ 37    In response, Troy's counsel stated that Troy testified that the fair market value of the vehicle, as represented, was $13,000. He further argued that the 2021 Carfax showed a trade-in value of $4810 at 96,000 miles. Counsel argued that anyone would know, even without testimony, that a car with four previous owners including a car rental company and two previous accidents was worth less than the same vehicle with one owner and no previous accidents. He argued that the court did not need testimony to know there is a difference in value and that they established the exact amount of damages by comparing the trade-in value from the Carfax ($4810) and the testimony that the sales price was $13,000.

¶ 38    Holzhauer argued that nobody testified about the value of the car, and nobody testified about what was included in the Carfax trade-in value of $4810. He further noted that the Carfax trade-in value was from 2021, and therefore was irrelevant because the vehicle was purchased on December 31, 2019. He stated there was no evidence of the car's fair market value for the only relevant valuation date, beyond Troy's purchase of the vehicle for $8500. He argued that the damages must be calculable, could not speculative, and the burden of proof was on Troy.

¶ 39    Following the argument, the court found "it is clear to me that the Plaintiff has not made a *prima facie* case, particularly on the issue of damages." Immediately, thereafter, the court noted that the Carfax was obtained on July 1, 2021, which was 18 months after the relevant date and provided a trade-in value of $4810, noting that a trade-in value was not the same as fair market value. It stated there had to be a basis for calculating the damages. It found Troy provided no way to compute damages based on a fair degree of probability. The court also acknowledged its prior denial of Troy's request for an expert and explained why the expert was disallowed. Thereafter, the court again found there was no evidence provided that would allow the court to calculate damages and entered judgment in favor of Holzhauer. Plaintiff timely appealed.

¶ 40                                    II. ANALYSIS

¶ 41    On appeal, Troy argues that the trial court's decision granting judgment to Holzhauer was erroneous as a matter of law. In support, he claims that numerous evidentiary decisions by the trial court were in error and, even if they were not, sufficient evidence was presented at trial on the issue of damages.

¶ 42                               A. Standard of Review

¶ 43    After a plaintiff completes the submission of its case-in-chief, a defendant may move for a finding in its favor. 735 ILCS 5/2-1110 (West 2020). A two-prong analysis is required to determine whether the motion should be granted. *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 275 (2003). "A plaintiff establishes a *prima facie* case by proffering at least 'some evidence on every element essential to [the plaintiff's underlying] cause of action.' " *Id.* (quoting *Kokinis v. Kotrich*, 81 Ill. 2d 151, 155 (1980)). If plaintiff fails to meet this burden, judgment is entered in defendant's favor. *Id.* Our review of a case dismissed at the first stage is *de novo*. *Id.*

15

¶ 44　However, if some evidence is found, the court moves to the second prong of the section 2-1110 analysis. *Id.* At the second stage, the court weighs all the evidence, determines the credibility of the witnesses, and draws reasonable inferences therefrom which may result in "negation of some of the evidence" presented by the parties. *Id.* at 276. After weighing the quality of the evidence, the court then determines "whether sufficient evidence remains to establish the plaintiff's *prima facie* case." *Id.* If there is sufficient evidence, the motion must be denied; however, if the evidence is insufficient, the court should grant the defendant's motion and dismiss the case. *Id.* Decisions issued under the second prong, *i.e.*, where some evidence is found, are reviewed under the manifest weight of the evidence standard. *Id.* A decision is against the manifest weight only where the opposite conclusion is clearly evident. *Gerber v. Hamilton*, 276 Ill. App. 3d 1091, 1093 (1995).

¶ 45　As noted above, a trial court's finding that a plaintiff failed to produce sufficient evidence to make a *prima facie* case can be issued when a first-stage analysis reveals no evidence for a required element, or a second-stage analysis reveals some evidence for a required element was submitted but the evidence is insufficient to prove the element after the trial court determines the credibility of that evidence. *Cryns*, 203 Ill. 2d at 275-76. Our standard of review is based on how the court reached its conclusion. *Id.* Troy claims the trial court's ruling was issued as a matter of law under a first prong analysis and therefore requires *de novo* review. Holzhauer notes both standards but provides no argument for either standard. In any event, we disagree that a *de novo* standard of review is warranted.

¶ 46　While the court's finding that plaintiff failed to make a *prima facie* case was the court's first statement issued after the parties concluded their arguments, it is clear that the trial court's ruling was based on its negation of plaintiff's submitted evidence, not on a complete lack of

16

proffered evidence by the plaintiff. Immediately after finding that plaintiff failed to make a *prima facie* case, the court addressed plaintiff's evidence. The court noted that the Carfax provided a trade-in value, not the fair market value. If further noted that the Carfax was dated 18 months after the purchase date. Thereafter, it specifically found it could not "put any basis on" the Carfax. This would be a negation of evidence after it weighed the evidence and drew a reasonable inference therefrom, *i.e.*, a second prong analysis. Thereafter, the court addressed the exclusion of Troy's expert witness's testimony. It is also notable that during the trial, the court addressed Troy's testimony and excluded that testimony based on insufficient qualifications, the latter of which was a credibility ruling. As the trial court weighed the evidence and provided credibility rulings related thereto, we deny plaintiff's request to apply a *de novo* review and will apply the manifest weight of the evidence standard to the trial court's order granting defendant's section 2-1110 motion. However, before we address the trial court's ultimate outcome, we first address its evidentiary rulings related to the damage evidence.

¶ 47                                      B. Evidentiary Rulings

¶ 48                              i. Exclusion of Troy's Testimony.

¶ 49     Troy's testimony valuing the 2012 Ford Escape at $2000 was originally classified as admissible lay opinion evidence with the court stating it was a weight issue, not an admissibility issue. Holzhauer questioned the decision and advised the court that Troy's value was based on the date of purchase, as opposed to its current value, and that Troy confirmed he was not an expert, and had no professional experience, valuing cars. Upon being advised of this information, the court struck Troy's testimony finding he had insufficient qualifications to value the car at the time of purchase. Thereafter, Troy's counsel made an offer of proof related to Troy's proposed testimony.

17

¶ 50 On appeal, Troy does not argue that the trial court erred in striking his testimony. Instead, he argues that the trial court abused its discretion in denying Troy's offer of proof. In support, Troy concedes that "generally a non-expert witness cannot give his opinion as to the value" but claims the situation is different, citing *People v. Newton*, 117 Ill. App. 2d 232, 235 (1969), and *Brenton v. Sloan's United Storage & Van Co.*, 315 Ill. App. 278, 280 (1942).

¶ 51 In *Newton*, the defendant was charged with criminal trespass to an automobile and theft of an automobile exceeding $150. *Newton*, 117 Ill. App. 2d at 234. Following his conviction, defendant appealed claiming, *inter alia*, that the State failed to prove the automobile's value exceeded $150. *Id.* At trial, the owner of the vehicle testified that he purchased the vehicle new and that the car was presently worth close to $1000. *Id.* On appeal, the court noted that testimony as to the worth of the property was proper proof of its value "[i]n the absence of contrary evidence." *Id.* at 235. It further noted that generally a nonexpert witness could not give his opinion as to value, but, citing *Brenton*, found that the "the owner of personal property has been allowed to testify to its value, where he has some familiarity with the property." *Id.* The court accepted the owner's testimony of the current value of the vehicle because he purchased the vehicle new in 1962 and owned it until the date of the theft, and therefore had sufficient knowledge and familiarity with the vehicle to know its value. *Id.* at 236. The court further noted that additional testimony revealed the vehicle was not only drivable and in average condition, but it was also capable of being driven at a high rate of speed. *Id.* The court found the owner was competent to testify as to the value of the vehicle on the date of the theft, and the weight of that testimony was for the trier of fact. *Id.*

¶ 52 In *Brenton*, 10 petitioners sued a storage company for its failure to return furniture and goods stored with the company that were destroyed by fire. *Brenton*, 315 Ill. App. at 279. Each plaintiff, after testifying to familiarity with the nature of the goods deposited, and to a knowledge

18

of the prevailing prices for such goods through shopping with friends, window shopping, as well as newspaper and radio advertisements, provided opinions as to the actual damage of the goods. *Id.* at 280. The court found that the plaintiffs, as owners of the property, were competent witnesses to testify as to the value of their belongings. *Id.*

¶ 53 Here, unlike *Newton* and *Brenton*, there was evidence that contradicted Troy's lay testimony. Additionally, the opinion allowed in *Newton* was based on the vehicle's current value and there was no dispute about the value of the car when purchased. Similarly, the opinions allowed in *Brenton* were based on current replacement value. Neither case allowed lay testimony to substitute for expert forensic valuation testimony.

¶ 54 Equally unmeritorious is Troy's claim on appeal that the trial court abused its discretion in denying Troy's offer of proof. "An offer of proof is a critical procedure to preserve a purported erroneous exclusion of evidence." *Snowstar Corp. v. A&A Conditioning & Refrigeration Service, Inc.*, 2024 IL App (4th) 230757, ¶ 73. "Where it is not clear what a witness would testify to, or what the basis for his testimony is, the offer of proof must be considerably detailed and specific, so that a reviewing court can thereby review whether the exclusion was proper." *Torres v. Midwest Development Co.*, 383 Ill. App. 3d 20, 26 (2008).

¶ 55 The language in *Torres* reveals counsel's confusion in claiming the trial court "denied" his offer of proof. An offer of proof is made by a party when it believes that its evidence was erroneously excluded. *Snowstar Corp.*, 2024 IL App (4th) 230757, ¶ 73. "The purpose of an offer of proof is to disclose to the trial judge and opposing counsel the nature of the offered evidence and to enable a reviewing court to determine whether exclusion of the evidence was proper." *People v. Andrews*, 146 Ill. 2d 413, 421 (1992). A refusal to allow a party to make an offer of proof can be evidence of trial court error. *In re Marriage of Suriano*, 324 Ill. App. 3d 839, 850 (2001).

19

However, here the trial court did not "deny" Troy's offer of proof as the court allowed Troy to make the offer.

¶ 56    Equally important is the quality of the offer of proof. "An offer of proof that merely summarizes the witness' testimony in a conclusory manner is inadequate." *Andrews*, 146 Ill. 2d at 421. Here, counsel's offer of proof stated, "That if permitted to testify [Troy] would testify that his opinion of the fair market value of the vehicle as it actually existed when he bought it would be $2,000." Notably, Troy's offer of proof neglects to provide this court with the basis of Troy's opinion and, therefore, is inadequate. However, the omission can be overlooked where the record clearly demonstrates the nature and substance of the proposed testimony. *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 495 (2002).

¶ 57    Here, Troy's testimony was stricken due to a lack of qualifications to provide a forensic valuation of the vehicle. The record confirms that Troy conceded that he was not an expert in valuing cars and had no professional experience in valuing cars. Further, neither *Brenton* nor *Newton* provide support for Troy's claim that his testimony was erroneously excluded by the trial court. More importantly, we note that, even if Troy's testimony was allowed, it would have no bearing on the outcome of the case as Troy's testimony was contradicted by his own evidence regarding the value of the car. Accordingly, we affirm the trial court's exclusion of Troy's testimony on the "as-is" value of the car at the time of purchase.

¶ 58       ii. Denial of Leave to Name an Expert and Offer of Proof Regarding Expert

¶ 59    Troy next argues that the trial court erred in denying his motion for leave to identify an expert after the discovery period expired. He also argues that the court erred in rejecting his request to extend the trial date and rejecting his offer of proof regarding Mr. Willbanks's testimony. We review a court's decision to deny a request for leave to untimely identify his expert for an abuse

20

of discretion. *McCall v. Chicago Board of Education*, 228 Ill. App. 3d 803, 812 (1992). A similar standard of review is utilized for the denial of a motion to continue a trial. *ICD Publications, Inc. v. Gittlitz*, 2014 IL App (1st) 133277, ¶ 88. The admission of expert testimony lies within the discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. *Torres v. Midwest Development Co.*, 383 Ill. App. 3d 20, 26 (2008).

¶ 60 Troy's initial issue raised is governed by the Illinois Supreme Court rules. See Ill. S. Ct. R. 201 (eff. Mar. 17, 2023) (addressing general discovery provisions); Ill. S. Ct. R. 213(f) (eff. Jan. 1, 2018) (addressing the identification and disclosure of expert witness testimony); Ill. S. Ct. R. 218 (eff. Feb. 2, 2023) (addressing disclosure of expert witnesses and completion of discovery prior to trial). The purpose of discovery rules is "to eliminate surprise and unfairness and afford a fair opportunity to investigate." (Internal quotation marks omitted.) *Florez v. Northshore University Healthsystem*, 2020 IL App (1st) 190465, ¶ 57. It is well established that the discovery process should not be conducted as a "tactical game." *Zagorski v. Allstate Insurance Co.*, 2016 IL App (5th) 140056, ¶ 39.

¶ 61 Despite three supreme court rules being utilized as the basis for Holzhauer's objection and the court's denial of Troy's motion for late disclosure, Troy's brief fails to cite or analyze any supreme court rule or cite any case law related to those rules. Similarly, no case law was cited in support of Troy's claim that the continuance should have been granted or the trial court's preclusion of Mr. Willbanks's testimony was in error. More confounding is the complete lack of argument submitted in the three paragraphs of Troy's brief addressing these issues.

¶ 62 The first paragraph simply provided the procedural history. The second paragraph claimed that "[a]lthough expert testimony was not required, as stated above, this expert testimony was very straightforward, a before and after analysis of [fair market value]." The remainder of that paragraph

21

provided a one sentence summary for Mr. Baldwin's testimony and a one sentence summary for Mr. Miller's testimony. The final paragraph stated, "Under these circumstances, it was an abuse of discretion to preclude Greg Willbanks from testifying as an expert on valuation/damages and at the same time refusing to continue a bench trial" for an additional 14 days[1] to meet the 60-day requirement of Illinois Supreme Court Rule 218.

¶ 63    We find Troy's brief on all three issues contrary to the mandates of Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020). Rule 341 requires appellants to submit argument that contains both "the contentions of the appellant and the reasons therefor" with citation to authority. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Here, the brief, at most, provided a one sentence argument, and failed cite any authority in support of its contentions of error. Accordingly, we find that Troy forfeited these issues for failing to comply with Illinois Supreme Court Rule 341(h)(7).

¶ 64                    C. Judgment in Favor of Defendant

¶ 65    After considering the evidence submitted in plaintiff's case-in-chief, the trial court found plaintiff failed to present sufficient evidence on the issues of damages and therefore held that plaintiff failed to establish a *prima facie* case. "Absolute certainty about the amount of damages is not necessary, but damages may not be predicated upon mere speculation, and the plaintiff must show a *basis* for computing damages with a fair degree of probability." (Emphasis in original.) *Castlerigg Master Investments, Ltd. v. AbbVie, Inc.*, 2021 IL App (1st) 200527, ¶ 23. The basis may not be predicated on " 'hypothesis, conjecture or whim.' " *City of Chicago v. Michigan Beach Housing Cooperative*, 297 Ill. App. 3d 317, 323 (1998) (quoting *In re Application of Busse*, 124 Ill. App. 3d 433, 438-39 (1984)).

---

[11]Troy's counsel requested a two-month continuance, not a two-week continuance, at the hearing.

¶ 66    To determine damages, decisions in Illinois generally follow the "benefit-of-the-bargain approach." *Giammanco v. Giammanco*, 253 Ill. App. 3d 750, 759 (1993). With this approach, "damages are determined by assessing the difference between the actual value of the property sold and the value the property would have had if the representations had been true." *Gerill Corp. v. Jack L. Hargrove Builders, Inc.*, 128 Ill. 2d 179, 196 (1989). In the context of fraud, as alleged here, damage is shown by establishing "the value the property would have had at the time of sale if the defects did not exist, less the value the property actually had at the time of sale due to the defects." *Posner v. Davis*, 76 Ill. App. 3d 638, 645 (1979).

¶ 67    As to the first value, *i.e.*, the value of the property at the time of the sale if no defect existed, Troy testified that the amount was $13,000 because that amount was "approximately" what he paid for the vehicle. We disagree. The purchase price of the 2012 Ford Escape was not $13,000. The purchase price of the vehicle was $8500.13. It was only the additional fees, the purchase of the vehicle protection plan warranty, and the additional cost attributed to the finance charges, that increased the ultimate amount Troy paid for the vehicle. Troy testified that fair market value of a vehicle incorporated the age of the vehicle, the number of previous owners, the condition of the vehicle, and the way it handled when driving. Those factors would determine a buyer's "maximum top dollar" of what he would be willing to pay. Here, it is clear—based on Troy's assertion that he purchased the vehicle believing it only had one owner and no accidents—the fair market value of the 2012 Ford Escape with one owner, no accidents, and 90,587 miles was $8500.13, as he clearly purchased the vehicle for that amount.

¶ 68    The second value required to determine damages is the fair market value of a 2012 Ford Escape with 90,587 miles, four previous owners, and two accidents. Evidence on this value was presented but the trial court found the evidence unworthy of weight and therefore insufficient to

23

meet plaintiff's burden of presenting a *prima facie* case. Accordingly, we address the evidence purporting to value the 2012 Ford Escape with multiple owners and accidents in 2019.

¶ 69                                     i. The 2021 Carfax

¶ 70    Troy argues that the trial court erred in finding the 2021 Carfax trade-in value for the vehicle was not evidence of damages. We disagree. The trial court specifically addressed the Carfax and noted that the document provided a trade-in value, not the fair market value. Generally, the trade-in value of a vehicle is less than the retail value for a vehicle. See *Shoop v. DaimlerChrysler Corp.*, 371 Ill. App. 3d 1058, 1060 (2007). The trial court further took issue with the fact that the Carfax was generated over 18 months after the vehicle was purchased. After addressing these deficiencies, the trial court found the document had no evidentiary value regarding the value of the 2012 Ford Escape on December 31, 2019, specifically noting that car values change over time and therefore the trade-in value for the vehicle on July 1, 2021, was "absolutely irrelevant" to determine the retail value of the vehicle as of December 31, 2019.

¶ 71    Troy argues, citing *Metro-Goldwyn-Mayer, Inc. v. Antioch Theatre Co.*, 52 Ill. App. 3d 122, 134 (1977), that the trial court could infer damages from the Carfax. In *Metro-Goldwyn-Mayer, Inc.*, the court found the evidence was sufficient to support a finding of fraud against the defendants but that the "exact computation of damages" was impossible. *Id.* at 134. The difficulty in computing the exact amount of damages stemmed from contracts employing an intricate form of payment, the defendant's failure to provide additional records addressing the receipts, and what appeared to be falsified records that were later destroyed by the defendant. *Id.* at 126-28. The court found that the amount of damages could not be determined with accuracy and the "cause of this uncertainty rest[ed] solely on the actions of defendants." *Id.* at 134. Relying on McCormick on Damages (1935), the court noted that "the controlling standard for measuring sufficiency of

24

damage proof in such instances" included five possible scenarios, including one that was based on defendant's actions or inactions. *Id.* Given the actions of the defendants the court found that sufficient proof of damages was provided. *Id.*

¶ 72    Here, Troy relies on a different standard than the one utilized in *Metro-Goldwyn-Meyer*. Troy relies on the McCormick factor that stated, "If the fact of damage is proved with certainty, the extent or amount may be left to reasonable inference." (Internal quotation marks omitted.) *Id.* However, we cannot find that the initial premise required, *i.e.*, certain damage, was met. The trial court clearly explained the defects associated with the Carfax and Troy provides no argument why the Carfax provided evidence of certain damage given the length of time elapsed between the purchase of the vehicle and procurement of the Carfax, and the fact that the document provided a trade-in value for a 2012 Ford Escape in 2021 and not the retail value of a 2012 Ford Escape in 2019. Given the lack of relevance associated with the Carfax, we cannot find the document was evidence of damages.

¶ 73                                    ii. Troy's testimony

¶ 74    Troy also claims that expert testimony was not required to establish the before and after fair market value for the 2012 Ford Escape. In support, Troy relies on *1472 N. Milwaukee, Ltd. v. Feinerman*, 2013 IL App (1st) 121191. We find Troy's reliance unwarranted.

¶ 75    In *Feinerman*, the property at issue was a commercial space in Chicago, Illinois. *Id.* ¶ 3. Plaintiffs agreed to sell the property for $1.2 million to Feinerman; however, Feinerman failed to appear at either closing scheduled and plaintiffs sold the property eight months later to a different party for $911,500. *Id.* ¶¶ 4-5. Plaintiffs sued Feinerman for breach of the original sales contract and claimed damages as the difference between the original sales contract and eventual sales contract. *Id.* ¶ 6.

25

¶ 76    On appeal the court noted that although the plaintiff failed to establish the amount of damages at the time of the breach, in similar sales involving land, the resale price, if obtained within a reasonable time and at the highest price possible after the breach, was some evidence of market value on the day of the breach. *Id.* ¶ 16. The court noted that a damage award for breach of contract was to place the nonbreaching party into the position he would have been in if the contract was performed and upheld the amount of damages awarded. *Id.* ¶ 17.

¶ 77    Here, we are not dealing with the purchase of land eight months after a broken real estate purchase contract; we are dealing with the "as-is" value of a car purchased in 2019 with an underlying claim of fraud. Even if we believed that land and motor vehicles could be valued in a similar fashion, which we do not, Troy submitted no evidence showing that anyone attempted to purchase the 2012 Ford Escape around the same time of his purchase or declined to purchase the vehicle prior to his purchase because they believed that $8500.13 was too much for the vehicle. Accordingly, *Feinerman* is easily distinguishable and inapplicable based on the lack of evidence submitted regarding the same purchase.

¶ 78    The necessity of expert testimony is governed by Illinois Rule of Evidence 702:

> "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Ill. R. Evid. 702 (eff. Jan. 1, 2011).

¶ 79    Thus, the rule requires that (1) the proffered expert testimony be helpful to the trier of fact in understanding a technical or complicated fact and (2) the expert be qualified to give the testimony sought. An expert's opinion assists the factfinder when it offers knowledge and experience that the average person generally lacks, and which is "beyond the ken of the average

juror." (Internal quotation marks omitted.) *Compton v. Ubilluz*, 353 Ill. App. 3d 863, 867 (2004). "Evidence is 'beyond the ken' of the average juror when it involves knowledge or experience that a juror generally lacks." *Id.*

¶ 80    As noted above, the value at issue is "the value the property actually had at the time of sale due to the defects." *Posner*, 76 Ill. App. 3d at 645. There is nothing in the record that would indicate any juror, or, in this case a judge holding a bench trial, would be able to value a 2012 Ford Escape with four owners and two accidents, without an expert's testimony.

¶ 81    Nor do we find Troy's general assertion that a vehicle with fewer owners and no accidents would have a higher fair market value than a vehicle with numerous owners and accidents particularly persuasive when contrary evidence was submitted, and Troy's testimony was vague. While Troy testified that the number of previous owners and accidents was relevant *to him* in determining the value of a vehicle, both Mr. Baldwin and Mr. Haselhorst testified that the number of previous owners or accidents was not relevant *to all* potential car purchasers. However, even if no contradictory testimony was presented, at no time did Troy testify how much each previous owner or accident would lessen the fair market value of any car, say nothing of the 2012 Ford Escape at issue. Accordingly, we cannot find that Troy's testimony was evidence of damages.

¶ 82                                iii. Mr. Hopkins's Testimony

¶ 83    The only other evidence regarding the vehicle's value elicited at the hearing was testimony from Mr. Hopkins. He agreed that, according to NADA, the retail value of the vehicle was $10,050. While it is unclear as to whether Mr. Hopkins's testimony addressed the value of a 2012 Ford Escape in December 2019 when Troy purchased the car or on the November 13, 2023, date of the hearing, Troy's purchase price of the vehicle was less than the NADA retail value. This evidence clearly fails to support a showing of damages.

27

¶ 84     Troy concludes by arguing that "the trial court could have concluded that the amount of damage is the difference between the FMV of the vehicle as represented ($13,000) and the trade-in value of the vehicle ($4,810), a difference of $8,190" and therefore, "it was error for the trial court to conclude Troy failed to show damages." We disagree. As stated above, the "as described" fair market value of the 2012 Ford Escape was $8500.13, as that was the amount of the vehicle purchased by Troy with the belief that it was a one owner, no accident, vehicle. The 2021 Carfax has no relevance in determining the fair market value of the 2012 Ford Escape "as purchased" because it was procured 18 months after the purchase date and provides a "trade-in" value, not the "retail value" of the vehicle. Troy's attempt to value the "as purchased" vehicle was correctly excluded from the evidence based on Troy's lack of qualifications in forensic valuation of a vehicle, and his general comments about a lower value based on ownership and accidents were both contradicted by the other testimony, vague in how much each owner or accident would reduce the value of the car, and provided no basis for the alleged general comment.

¶ 85     As stated above, based on the trial court's analysis of the evidence, we review its decision under a manifest weight of the evidence standard. *Cryns*, 203 Ill. 2d at 276. We will only find the decision was contrary to the manifest weight of the evidence "when an opposite conclusion is clearly evident or the finding is palpably erroneous." *Newcombe v. Sundara*, 274 Ill. App. 3d 590, 594 (1995). Here, neither benchmark was met. Accordingly, we affirm the trial court's judgment in favor of defendant.

¶ 86                                III. CONCLUSION

¶ 87     For the reasons stated herein, we affirm the trial court's order granting Holzhauer's motion for judgment following the submission of plaintiff's case-in-chief evidence.

28

¶ 88    Affirmed.